720 A.2d 79

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Mumia ABU–JAMAL, a/k/a Wesley Cook, Appellant.**

Supreme Court of Pennsylvania.

Submitted Sept. 2, 1997.

Decided Oct. 29, 1998.

Reargument Denied Nov. 25, 1998.

486

496

Leonard I. Weinglass, David Rudovsky, Philadelphia, Daniel R. Williams, New York City, Stephen W. Hawkins, Philadelphia, Rachel H. Wolkenstein, for M. Abu–Jamal.

Catherine Marshall, Philadelphia, Robert A. Graci, Harrisburg, for Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION OF THE COURT*

CAPPY, Justice.

This is a direct appeal from the order .of the Court of Common Pleas of Philadelphia County denying Appellant's petition for collateral relief filed pursuant to the Post Conviction Relief Act (PCRA) 42 Pa.C.S § 9541 et seq. For the reasons that follow, we affirm the orders of the court below; all three of which deny Appellant post-conviction relief.

In the underlying trial, a jury found Appellant guilty of first degree murder in the December 9, 1981 shooting death of Philadelphia police officer Daniel Faulkner. Appellant was also found guilty of possession of an instrument of crime. At the conclusion of the penalty phase hearing, the jury found one aggravating circumstance, the killing of a police officer acting in the line of duty,[1] and one mitigating circumstance, no significant history of criminal convictions.[2] Finding that the aggravating circumstance outweighed the mitigating circumstance, the jury returned a verdict of death. Post-trial motions were ultimately denied whereupon a consecutive sentence of two and one-half to five years was imposed on the weapons offense. On direct appeal, this court affirmed the judgments of sentence. *Commonwealth v. Abu–Jamal,* 521 Pa. 188, 555 A.2d 846 (1989).

Appellant filed a petition for certiorari in May 1990 in the Supreme Court of the United States, which was denied. Appellant's original and second requests for rehearing were also denied by the Court.

On June 1, 1995, a writ of execution was signed by the Governor, setting execution for August 17, 1995. A petition for stay of execution, a petition for discovery, a petition for post-conviction relief and a petition for recusal of the Honorable Albert F. Sabo, the judge assigned to hear the PCRA petition, were then filed by Appellant.[3] The PCRA court

1. 42 Pa.C.S. §9711(d)(1).
2. 42 Pa.C.S. §9711(e)(1).
3. Judge Sabo also presided over the jury trial in 1982.

ultimately denied Appellant's request for recusal and an emergency appeal therefrom was denied by this court.

By order entered July 14, 1995, the PCRA court dismissed Appellant's motion for discovery, but granted his request for an evidentiary hearing. Then, on August 7, 1995, the PCRA court granted the request for stay of execution.

The evidentiary hearing on this matter began on July 26, 1995 and ended on August 15, 1995. On September 15, 1995, the PCRA court filed an extensive opinion detailing its findings of fact and conclusions of law and an accompanying order denying post-conviction relief. A direct appeal to this court followed.

During the pendency of that appeal, Appellant filed a petition with this court seeking a remand for the express purpose of taking additional testimony from one Veronica Jones whom the defense alleged was a "newly available witness." [4] According to Appellant's petition, Ms. Jones would provide important "new" evidence that days before she took the stand as a defense eyewitness at the 1982 trial of Appellant, Philadelphia police contacted her while she was incarcerated on felony armed robbery charges and threatened and coerced her to change her testimony. It was further alleged that Ms. Jones would testify that she, indeed, succumbed to this police intimidation and accordingly altered her testimony at trial by repudiating her true eyewitness account that she saw two men flee the scene immediately after the shooting. This court ultimately entered an order remanding the matter to the PCRA court to conduct an evidentiary hearing regarding this claim. After holding a hearing thereon, the PCRA court disagreed with Appellant's contention; specifically, the court concluded that the testimony of Ms. Jones did not constitute "after-discovered evidence." Alternatively, the court ruled that even assuming such testimony were to be incorporated into the record, her testimony was of such an incredible nature that it would provide no relief to Appellant.

4. Ms. Jones testified at Appellant's trial in 1982. It appears from Appellant's argument that what he is truly claiming is that the information that Ms. Jones would now offer is "newly available."

Subsequently, Appellant filed two additional applications for remand with this court. In those applications Appellant sought a variety of relief, including, first, a remand for the express purpose of eliciting the testimony of one Pamela Jenkins who would allegedly provide further support for Appellant's claim of police intimidation and/or coercion of witnesses and whose testimony would allegedly demonstrate that the prosecution had withheld pertinent information from the defense in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Appellant also asserted a request for additional discovery, including specifically, discovery of both the prosecution and police files in their entirety, and a request that the matter be reassigned to a different judge on remand. Finally, Appellant sought a remand to supplement his *Batson* [5] claim based upon a videotape released after his trial which allegedly demonstrates the Philadelphia District Attorney Office's policy of systematically striking African–American venirepersons in violation of *Batson*. [6]

By order dated May 30, 1997, this court granted Appellant's request for a second remand for the limited purpose of taking additional testimony with respect to Pamela Jenkins, but denied his request for a new post-conviction judge as well as his requests to supplement his *Batson* claim with the videotape and to take discovery regarding that claim. After hearing, the PCRA court issued an opinion and order concluding that this additional testimony did not warrant post-conviction relief. This appeal followed. [7]

The circumstances surrounding the killing were stated by this court in our opinion on direct appeal as follows:

5. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

6. Appellant originally raised this *Batson* claim to this court on direct appeal. He again raised this claim in his PCRA petition.

7. In reviewing an order granting or denying post-conviction relief, this court's standard of review is limited to a determination of whether the court's conclusions are supported by the evidence of record and whether they are free of legal error. *Commonwealth v. Lutz*, 492 Pa. 500, 505–507, 424 A.2d 1302, 1305 (1981).

The evidence presented at trial established that at approximately 3:55 a.m. on December 9, 1981, Officer Faulkner made a routine car stop on Locust Street between Twelfth and Thirteenth Streets in Center City Philadelphia. The car was driven by the appellant's brother, William Cook. After making the stop, Officer Faulkner called for assistance on his police radio, requesting a police wagon to transport a prisoner. While Faulkner was trying to handcuff Cook, the appellant ran from across the street and shot the officer once in the back. Faulkner was able to fire one shot, which wounded the appellant, but after Faulkner had fallen to the ground the appellant shot him four more times at close range; once through the center of the face. The appellant was found slumped against the curb in front of Cook's car and taken into custody by police officers who arrived on the scene within thirty to forty-five seconds. The officers had been in the area and were turning onto Locust Street from Twelfth Street in response to Faulkner's radio request. They were flagged down by a cab driver who had witnessed the shooting while stopped at the intersection of Thirteenth and Locust. Two other pedestrians also witnessed the incident and identified the appellant as the perpetrator, both at the scene and during the trial.

*Abu–Jamal,* 521 Pa. at 193–194, 555 A.2d at 848.

To be eligible for collateral relief, Appellant must satisfy the dictates of the PCRA, which, at the time of the filing of Appellant's PCRA petition, provided in relevant part as follows.[8] Sections 9543(a)(2), (3) and (4) required that Appellant plead and prove by a preponderance of the evidence:

(2) That the conviction or sentence resulted from one or more of the following:

(i) A violation of the Constitution of Pennsylvania or laws of this Commonwealth or the Constitution of the United States which, in the circumstances of the particular case, so undermined the truth-determining

---

8. Although the PCRA was amended in November, 1995, Appellant filed his PCRA petition on June 5, 1995. Accordingly, the Act as it existed prior to the 1995 amendment is applicable for purposes of this appeal.

process that no reliable adjudication of guilt or innocence could have taken place.

(ii) Ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

(iii) A plea of guilty unlawfully induced where the circumstances make it likely that the inducement caused an individual to plead guilty.

(iv) The improper obstruction by Commonwealth officials of the petitioner's right of appeal where a meritorious appealable issue existed and was properly preserved in the trial court.

(v) A violation of the provisions of the Constitution, law or treaties of the United States which would require the granting of Federal habeas corpus relief to a State prisoner.

(vi) The unavailability at the time of trial of exculpatory evidence that has subsequently become available and that would have affected the outcome of the trial if it had been introduced.

(3) That the allegation of error has not been previously litigated and one of the following applies:

(i) The allegation of error has not been waived.

(ii) If the allegation of error has been waived, the alleged error has resulted in the conviction or affirmance of sentence of an innocent individual.

(iii) If the allegation of error has been waived, the waiver of the allegation of error during pretrial, trial, posttrial or direct appeal proceedings does not constitute a State procedural default barring Federal habeas corpus relief.

(4) That the failure to litigate the issue prior to or during trial or on direct appeal could not have been the result of any rational strategic or tactical decision by counsel.

Thus, the first inquiry is whether the allegation of error has been previously litigated. Relevant to Appellant's petition, section 9544(2) provides that an issue is deemed "previously litigated" where "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." *See Commonwealth v. Szuchon*, 548 Pa. 37, 693 A.2d 959 (1997); *Commonwealth v. Crawley*, 541 Pa. 408, 413, 663 A.2d 676, 678 (1995).

If an issue has not been finally litigated, inquiry is then made as to whether the issue has been waived. An issue is deemed waived if the petitioner failed to raise it and "it could have been raised before the trial, at the trial, on appeal, in a habeas corpus proceeding or any other proceeding actually conducted or in a prior proceeding actually conducted or in a prior proceeding actually initiated under this subchapter." 42 Pa.C.S. § 9544(b). Waiver is excused under 42 Pa.C.S § 9543(a)(3)(ii) and (iii) only if the alleged error has resulted in the conviction or affirmance of sentence of an innocent individual or where the petitioner can demonstrate that his trial or appellate counsel was ineffective. *Commonwealth v. Beasley*, 544 Pa. 554, 562–566, 678 A.2d 773, 777–778 (1996). A claim of ineffectiveness must be raised at the earliest possible stage in which the allegedly ineffective counsel no longer represents the petitioner. *Commonwealth v. Griffin*, 537 Pa. 447, 452–454, 644 A.2d 1167, 1170 (1994). However, a claim of ineffectiveness will not be deemed waived provided the petitioner has layered the claim by alleging the ineffectiveness of all prior counsel for failing to pursue the claim. *Commonwealth v. Chmiel*, 536 Pa. 244, 249–251, 639 A.2d 9, 12 (1994).[9]

9. It is important to note at this point that many of the issues raised by Appellant were not raised on direct appeal. Rather than posit appellate counsel's ineffectiveness in failing to raise these issues on direct appeal in his discussion regarding each distinct issue, Appellant sets forth, in a specifically enumerated issue, a boilerplate claim of appellate counsel's ineffectiveness in failing to raise meritorious issues on appeal. Appellant contends that many of the issues raised in his PCRA petition are based on evidence outside the trial record and that, therefore, they could not have been presented fully on direct appeal. Appellant asks that in the event this court deems any of those issues waived for failure

The standards for determining claims of ineffective assistance of counsel are well settled. A petitioner is required to demonstrate: (1) that the underlying claim is of arguable merit; (2) that counsel's action or inaction was not grounded on any reasonable basis designed to effectuate his client's interest; and (3) that but for that act or omission, the outcome of the proceedings would have be different. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987). There is a presumption in our law that counsel is effective. *Commonwealth v. Miller*, 494 Pa. 229, 431 A.2d 233 (1981). It is Appellant's burden to prove all three prongs of this ineffectiveness standard. *Commonwealth v. Travaglia*, 541 Pa. 108, 118–120, 661 A.2d 352, 357 (1995). Further, if, upon review, it is clear that Appellant has failed to meet the prejudice prong, the claim may be dismissed on that basis alone without determination of whether the first and second prongs of the ineffectiveness standard have been met. *Id.* at 118–120, 661 A.2d at 357 (citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Also, a petitioner cannot obtain PCRA review of previously litigated claims by alleging ineffective assistance of counsel and presenting new theories of relief to support the previously litigated claims. *Beasley*, 544 Pa. at 564–566, 678 A.2d at 778.

The first issue raised by Appellant is that Judge Sabo, who presided over the PCRA proceedings, evidenced bias and partiality and that Appellant was thereby denied a full and fair PCRA hearing.[10]

to raise the same on direct appeal, that they be reviewed as claims of ineffectiveness of appellate counsel. In conjunction with this issue, Appellant notes this court's tradition of entertaining all claims raised in a capital case, whether on direct appeal or collateral attack, irrespective of waiver. However, where, as here, an appellant has layered his claims so as to escape the bar of waiver, the relaxed waiver doctrine has no applicability.

10. Appellant moved, albeit unsuccessfully, for the judge's recusal prior to the start of PCRA testimony. Appellant alleged specifically that Judge Sabo openly demonstrated, during Appellant's trial in 1982, his bias and hostility towards Appellant and that Judge Sabo had a reputation for bias against defendants in general and African American defendants in particular, such that the proceedings would be lacking the fundamental aspect of the appearance of fairness and impartiality.

Appellant's initial argument respecting this issue is that the judge's bias and hostility was amply displayed during the PCRA proceedings and was of such notoriety as to dictate his recusal. In support of this claim, Appellant submits that the court failed to give the defense a reasonable amount of time to prepare for the hearing insofar as the court gave only two days advance notice of the hearing date; that the PCRA court denied over twenty-five (25) subpoenas; that the court either precluded testimony completely or repeatedly cut short testimony offered by Appellant; that the court repeatedly threatened counsels for the defense with contempt, ultimately incarcerating one and fining another; that the court, in its findings of fact, made blatantly inaccurate statements; that Judge Sabo's allegiance to the Fraternal Order of Police (FOP) via his past membership in the FOP "inspired" his biased findings; that the court adopted almost verbatim, the prosecution's findings of fact; and, finally, that the court repeatedly denied the defense the discovery it requested. In his brief to this court following the hearing on the second remand, Appellant submits that further evidence of the court's bias was amply demonstrated at this remand hearing. In that brief, he essentially argues, as he does with respect to the conduct of the initial hearings, that the court evidenced its settled bias against the defense by denying the defense the opportunity to present proffered witnesses and denying virtually all of the defense's discovery requests.

In his motion for recusal, Appellant set forth specific examples of rulings or comments allegedly made during trial which showed the judge's bias. The Commonwealth, in its answer to that motion, responded specifically to each of those instances, many times indicating, correctly, that Appellant's recitation of the trial evidence was distorted or incomplete. On July 12, 1995, the court held a hearing on this recusal motion during which both sides presented argument in accord with the previously filed motion and answer. At the conclusion of argument, the court denied the motion for recusal.

Appellant again raised the issue of recusal in conjunction with his application for a second remand. There he simply requested that, for all the reasons expressed in his original brief to the court, the matter should be reassigned upon remand to another judge. This request was explicitly denied by this court in its order of May 30, 1997.

 The standards for recusal are well established. It is the burden of the party requesting recusal to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially. *Rizzo v. Haines*, 520 Pa. 484, 512–513, 555 A.2d 58, 72 (1989); *Commonwealth v. Miller*, 541 Pa. 531, 664 A.2d 1310 (1995). As a general rule, a motion for recusal is initially directed to and decided by the jurist whose impartiality is being challenged. *Commonwealth v. Travaglia*, 541 Pa. at 143–145, 661 A.2d at 370, citing *Goodheart v. Casey*, 523 Pa. 188, 565 A.2d 757 (1989). In considering a recusal request, the jurist must first make a conscientious determination of his or her ability to assess the case in an impartial manner, free of personal bias or interest in the outcome. The jurist must then consider whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary. This is a personal and unreviewable decision that only the jurist can make. *Goodheart v. Casey*, 523 Pa. 188, 201–203, 565 A.2d 757, 764 (1989). Where a jurist rules that he or she can hear and dispose of a case fairly and without prejudice, that decision will not be overruled on appeal but for an abuse of discretion. *Id.* at 199–201, 565 A.2d at 763. In reviewing a denial of a disqualification motion, we recognize that our judges are honorable, fair and competent. *Reilly v. SEPTA*, 507 Pa. 204, 221–223, 489 A.2d 1291, 1300 (1985).

 In arguing that the judge's hostility and bias towards Appellant was notorious, Appellant relies upon several newspaper and magazine articles which criticized Judge Sabo's behavior during the PCRA proceedings. The opinions of a handful of journalists do not, however, persuade us that Judge Sabo's decision not to recuse himself was in error. Moreover, our careful review of the proceedings reveals that none of the challenged behavior on the part of Judge Sabo evidences an inability to preside impartially.

While there are certainly instances in the record where the judge displays displeasure and/or impatience, those instances were, in large part, a direct result of obstreperous conduct on

the part of Appellant's counsel. The record reveals instances where defense counsel refused to accept a particular ruling offered by the court, relentlessly urging the court to reconsider. Although we certainly do not condone unjustified or indiscriminate rhetoric on the part of a presiding judge, we are nevertheless mindful of the fact that judges, too, are subject to human emotion. It simply cannot be denied that this particular case was one that was not only highly publicized but also highly emotionally charged. As a result, the judge's duty to maintain the judicial decorum of the proceedings was, at times, met with great resistance. Upon review of the entire recòrd, we cannot conclude that any of Judge Sabo's intemperate remarks were unjustified or indiscriminate nor did they evidence a settled bias against Appellant.

Appellant submits that Judge Sabo's impartiality was demonstrated, in large part, by his rulings, which according to Appellant were almost invariably in favor of the prosecution. Adverse rulings alone do not, however, establish the requisite bias warranting recusal, especially where the rulings are legally proper. *Commonwealth v. Miller*, 541 Pa. 531, 664 A.2d 1310 (1995); *Travaglia*, 541 Pa. at 137–139, 661 A.2d at 367. While, indeed, there were numerous rulings made against the defense, our review of the entire record reveals numerous rulings made against the prosecution as well. Moreover, many of the adverse rulings complained of were necessitated by the defense's repeated attempts to secure evidence which was only "believed" to exist or by its attempts to present witnesses who were clearly only peripherally, if at all, relevant to the scope of the PCRA proceedings or involved the court's denial of proffered testimony based upon the defense's failure to establish a proper foundation for the admission thereof. In any event, we cannot conclude that any of the rulings were legally improper. Respecting Appellant's claim that the court unfairly rushed the proceedings to the detriment of Appellant, we note the PCRA court's obvious, and we believe, justified, concern that it was the defense strategy, in part, to delay the proceedings. As noted by the PCRA court, Appellant's petition was clearly not the result of

hurried investigation and/or haphazard preparation. Appended to the petition itself were numerous affidavits and statements of witnesses who were allegedly available at the time of the filing of the petition to proffer testimony in support of Appellant's claims.[11]

Appellant asserts further that Judge Sabo possessed deep-rooted bias that warranted his recusal here. Specifically, he asserts that the judge maintained an adversarial relationship with Appellant during the actual trial in 1982, and that the judge's prior membership in the FOP presupposes his allegiance to the prosecution in this matter. Our review of the record evidences, first, that during trial in 1982, Judge Sabo displayed no such adversarial position towards Appellant. Rather, we find evidence therein that quite the contrary was true; that it was Appellant who, from the very beginning of the trial proceedings, openly criticized Judge Sabo and repeatedly asserted that he would not abide by the court's rulings. The trial record reveals numerous outbursts and displays of intemperate behavior on the part of Appellant. Judge Sabo, for the most part, displayed much patience with Appellant's diatribes. At those points when it became necessary for the judge to restore decorum in the proceedings, he properly did so. Simply stated, Appellant's own disruptive behavior cannot be used to demonstrate that the judge bore hostility towards him.

As for Appellant's claim that the judge possessed an allegiance to the FOP so as to cloud his judgment in this matter, again, we find no support for such a claim in the record. A jurist's former affiliation, alone, is not grounds for disqualification. Cf, *Commonwealth v. Comer,* 552 Pa. 527, 716 A.2d 593 (1998); *Commonwealth v. Darush,* 501 Pa. 15, 459 A.2d 727 (1983).[12]

11. In any event, this court ultimately granted Appellant a delay of an additional week.

12. Appellant, in a footnote, asserts that Judge Sabo, because he was a senior judge, lacked jurisdictional authority to preside over this PCRA proceeding. This claim lacks even arguable merit and we, thus, summarily reject it.

■ Generally, it is deemed preferable for the same judge who presided at trial to preside over the post-conviction proceedings since familiarity with the case will likely assist the proper administration of justice. It is only where it is shown that the interests of justice warrant recusal that a matter will be assigned to a different judge. *Commonwealth v. Rashed*, 496 Pa. 26, 436 A.2d 134 (1981). For all the reasons discussed, this standard has not been met in the instant matter. In conclusion, we simply cannot discern from the record that Judge Sabo abused his discretion in denying recusal.

■ A second argument reiterated by Appellant throughout the PCRA proceedings is that the PCRA court erred in denying his discovery requests. He claims both that the PCRA provides for such discovery, and that the evidence presented by the defense demonstrated police and/or prosecution misconduct that warranted discovery of the entire Commonwealth file in this matter. In short, Appellant essentially requested wholesale discovery of whatever information he "believed" to exist and/or of entire files so that he could discern whether his assertions were true. Such a request exceeds even that to which a defendant is entitled in pretrial discovery. *See generally*, Pa.R.Crim.P. 305.

■ Appellant submits that Pa.R.Crim.P. 1508 provides for discovery in PCRA proceedings.[13] In making this argument, Appellant employs specific terms of the rule and argues that "[r]ule 1508's broad grant of authority to a court to enter

---

**13.** Rule 1508, which applies to PCRA proceedings, generally provides that the PCRA court shall schedule a hearing where the Commonwealth files a motion to dismiss alleging delay on the part of the defendant or where the petition and answer, if any, raises material issues of fact. Relevant to Appellant's contentions, rule 1508 provides, in relevant part, that:

(a) ...

The judge shall schedule the hearing for a time that will afford the parties a reasonable opportunity for investigation and preparation, and shall enter such interim orders as may be necessary in the interests of justice.

(b) The judge, on petition or request, shall postpone or continue a hearing to provide either party a reasonable opportunity, if one did not exist previously, for investigation and preparation regarding any new issue of fact raised in an amended petition or amended answer.

'such orders as may be necessary' to afford a party the opportunity 'for investigation' before a hearing plainly contemplates discovery orders." (Brief of Appellant at p. 28). We find this particular argument to be lacking in merit. Rule 1508 nowhere addresses the right of discovery. In providing for "investigation," the rule clearly contemplates only that each party be given a reasonable opportunity to further investigate and/or prepare where such opportunity did not previously exist. The ability of a party to conduct investigation into the claims being raised in a PCRA petition simply does not translate into a right of discovery; especially the type of discovery being sought by Appellant in the instant matter.[14] As noted above, Appellant's petition is certainly not the product of a hurried investigation or haphazard preparation. Rather, as Appellant's own assertions bear out, he conducted extensive investigation into the preparation of this PCRA petition. Moreover, Appellant received extensive discovery during the course of his trial in 1981–1982. And, while Appellant asserts that material information, mostly regarding police coercion of witnesses and/or promises in exchange for favorable testimony, was withheld by the prosecution at the time of trial, as will be discussed more fully *infra*, many, if not all, of Appellant's specific assertions have been found to be incredible.

In further support of his claim that the court erred in repeatedly denying his discovery requests, Appellant posits that 42 Pa.C.S. § 9543(a)(2)(v), which permits PCRA relief on any basis "which would require the granting of Federal habeas corpus relief to a State prisoner," provides a further basis for allowing discovery. Appellant submits that *McCleskey v. Zant*, 499 U.S. 467, 498, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) holds that colorable claims raised in a habeas corpus petition

14. Given Appellant's strenuous argument that he has proven his right to collateral relief, we find his current claim, that the order denying discovery significantly hampered his ability to conduct a reasonable investigation and to prepare for the PCRA hearing, to be somewhat disjointed. It cannot be that one has proven his/her claim; yet also be true that the inability to obtain discovery on that precise claim resulted in a denial of one's right to prove that claim.

512

include claims which require discovery. Appellant's interpretation of *McCleskey* is not correct. What that case held, in relevant part, is simply that a habeas corpus petitioner is required to present all of his or her claims that could be gleaned upon reasonable investigation. In other words, the case emphasized that it was the burden of the petitioner, just as it is in the instant PCRA proceedings, to present and prove his claims. In sum, Appellant's claim that he is entitled to discovery warrants no relief.[15]

Appellant next claims relief based upon the PCRA testimony of Officer Gary Wakshul. Officer Wakshul was one of the police officers who escorted Appellant to the hospital the morning of the shooting and guarded him while he awaited treatment. At trial, two witnesses, Patricia Durham, a hospital security guard, and Gary Bell, another police officer, testified that Appellant made a statement, at the hospital, to the effect that "I shot him ... I hope the m.... f.... dies." Appellant claims that if Officer Wakshul had testified at trial, he would have exposed this "confession" as false. In order to adequately address this issue it is first necessary to set forth in some detail the facts bearing on this issue.

Officer Wakshul gave three statements regarding this matter. His first statement, taken at 5:50 a.m. on the morning of the shooting, contained the statement: "He [Appellant] made no comments." His second statement, given on December 16, made no mention of an admission on the part of Appellant, but as noted *infra*, the subject matter of that statement was narrowly tailored. In the third statement, taken during an Internal Affairs Bureau investigation initiated by Appellant's complaints of mistreatment, Officer Wakshul reported having heard Appellant's admission that "I shot him ... I hope the m... f... dies." On the last day of trial testimony, the

15. We note that Pa.R.Crim.P. 1502(e)(2), which was added in 1997 and thus, is not applicable to Appellant's PCRA petition, provides that no discovery shall be permitted on a first counseled petition in a death penalty case, except upon a showing of "good cause." However, even assuming this new subsection was applicable to the instant matter, Appellant's request for discovery which is premised only on unsubstantiated claims of police and/or prosecutorial misconduct, would not be granted.

defense attempted to call Officer Wakshul, but was informed that he had gone on vacation and hence was unavailable to testify. Following a sidebar discussion regarding this proposed witness, the court denied a defense request to delay the proceedings so they could search for Officer Wakshul. It is apparent from review of this sidebar discussion that the basis for the court's denial was the defense's belated request to have this officer testify. The record demonstrates that the defense was aware of the existence of Officer Wakshul as well as the substance of his statements well before this last day and, thus, its belated request was seen as merely a delay tactic.

At the PCRA hearing, Officer Wakshul testified that he did not stand guard over Appellant at all times; that there were several other officers also at the hospital, none of whom he could recall. (N.T. 8/1/95 p. 22). Officer Wakshul explained the omission of the information regarding Appellant's confession in the first statement by saying that he was emotionally overwrought after hearing Appellant state that he had shot the officer and then seeing the body of Officer Faulkner on a gurney and that he remembers little of what transpired after he heard Appellant's exclamation. (N.T. 8/1/95 p. 71). Specifically, Wakshul testified that when Appellant uttered this confession, Wakshul was so stunned that he stumbled into an alcove and began to cry. He then went outside in an effort to regain his composure. He testified that upon his eventual return, he remembers little else but having seen Officer Faulkner's feet on a gurney. Admitting that his recollection after leaving the hospital was somewhat weak, Wakshul testified that he remembered being in the Homicide Unit and, after leaving there, crashing his vehicle into a cement pole. (N.T. 8/1/95 pp. 25–26). He testified that he and Officer Faulkner were friends and that the fact that a police officer was killed was trying. (N.T. 8/1/95 p. 5). He explains the second statement by saying that he was simply answering very specific questions relating to specific items and was not asked whether he had heard the admission.[16] (N.T. 8/1/95 p. 64).

16. While Appellant takes issue with the trial court's failure to mention this second statement, Appellant himself notes that this second inter-

Appellant contends that the confession was concocted and that, by negative inference, Officer Wakshul's testimony would have revealed the falsity of the confession evidence. He claims, therefore, that Wakshul was a "crucial *Brady* witness." [17] According to Appellant, had the confession truly been uttered, it is simply incredible that Officer Wakshul would have failed to report hearing that admission when he gave those first two statements. Appellant claims he was unable to muster an attack on this confession for the following reasons: first, because the prosecution engineered his absence; second, because the trial court erred in denying the defense a continuance so as to secure the presence of Wakshul; and third, because trial counsel was ineffective for failing to call Mr. Wakshul.

■■ Appellant's claim lacks merit for several reasons. First, as noted above, Wakshul testified that his failure to report the confession in his initial statement was due to his emotional state at that time. The PCRA court found this explanation credible. Where, as here, there is record support for a PCRA court's credibility determinations, we, as a reviewing court, are bound by those determinations. *Beasley*, 544 Pa. at 564–566, 678 A.2d at 778. In addition, hospital security guard Patricia Durham reported the exact same admission to her superiors the day after Appellant made it. (N.T. 6/24/82

view concerned only the subjects of Appellant's clothing and Officer Faulkner's missing camera. (Brief of Appellant at p. 32). Accordingly, it does not appear that this omission by the PCRA court in any way undermines the court's findings and conclusions regarding this matter.

17. While Appellant offers no legal analysis on this statement, he is referring to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which as noted in more detail *infra*, holds that the prosecution's deliberate suppression of evidence favorable to the defense constitutes a violation of due process. In support of this current claim, Appellant cites *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), which held that the suppression of exculpatory witness statements violated *Brady*. Those statements revealed significant inconsistencies and self-incriminating assertions of the eyewitness which the Court found would have, *inter alia*, raised opportunities for the defense to attack the thoroughness of the investigation. However, as noted *infra*, no statements of Wakshul were withheld by the prosecution and the failure to call Wakshul to testify at trial regarding these statements was of Appellant's own making.

pp. 45–52). Wakshul testified that at the time he gave the third statement, in response to the Internal Affairs Bureau investigation, he was not aware that Ms. Durham had given a similar statement. (N.T. 8/1/95 pp. 47–48). Wakshul testified that he did not know Durham. (N.T. 8/1/95 p. 48, 117). In addition, Durham testified at trial that she told no one but her superiors about her statement given the day after the shooting. (N.T. 6/24/82 pp. 48–52).

Furthermore, in this third interview, Wakshul stated, also for the first time, that after the statement of confession was uttered by Appellant, someone responded "if he dies, you die." During his PCRA testimony, Wakshul acknowledged that he was aware that if it was an officer that uttered this statement, he or she would be subject to an investigation for making such a remark.[18] ( N.T. 8/1/95 p.113). Given all this, we agree with the PCRA court's conclusion that there was no credible evidence to suggest that Wakshul fabricated the confession. Accordingly, Appellant's claim that Wakshul was a key *Brady* witness is without merit.

Also, the law is clear that no claim of ineffectiveness will lie where it can be shown that the defendant, and not counsel, was in control of trial strategy. *Commonwealth v. Pierce*, 537 Pa. 514, 526–528, 645 A.2d 189, 196 (1994). We note that the PCRA court explicitly found incredible trial counsel's statements at the PCRA hearing, to wit, that it was counsel's fault alone that he did not make a timely attempt to call Officer Wakshul at trial. The court further found that it was Appellant's decision, and not that of trial counsel, to call Officer Wakshul at the last minute.[19] The court's findings

18. Although Wakshul testified that he did not know who made this statement, it was revealed through further questioning that Officer Gary Bell had admitted in testimony at trial that he, in fact, uttered the statement to Appellant. (N.T. 8/1/95 p. 116; 6/24/82 pp. 28–29, 135–36).

19. Appellant's trial counsel, Anthony Jackson, testified at the PCRA hearing that it was his decision to call Wakshul and that it was his fault that Wakshul was not called until the last minute. (N.T. 7/27/95 pp. 67, 195). However, at trial, Mr. Jackson stated that he did not know that he would be calling Mr. Wakshul, and that he had just been informed

here are supported by the record. Accordingly, those findings are binding on this court. *Beasley, supra.* Thus, Appellant's claim regarding trial counsel's performance with respect to Officer Wakshul warrants no relief. In. any event, had Wakshul testified, that testimony would not have benefited Appellant; rather, it would have prejudiced him since it would have been consistent with Durham and Bell's trial testimony.

Finally, there is no evidence that the prosecution orchestrated Officer Wakshul's unavailability.. Officer Wakshul testified that all officers were asked to "try" to be available during their vacations. (N.T. 8/1/95 pp. 80–83). He further testified that he did remain at his home for the beginning part of his vacation, which lasted ·from June 25, 1982 through July 8, 1982, but that when he was not notified that he was to appear, he left the city during the latter part of this vacation. He testified as well that no one asked him to absent himself from the Philadelphia area so as not to be available for trial. (N.T. 8/1/95 pp. 94, 100–101, 118–122). The court found this testimony credible. As the record supports this determination, this court is bound by that finding. *Beasley, supra.*

Given all the foregoing, Appellant's .claim lacks merit since Appellant failed to prove that Wakshul was available to testify at trial; failed to prove that, even if available, Wakshul's testimony would have revealed that the confession was fabricated; and failed to establish trial counsel's ineffectiveness since the testimony, if presented at trial, would have been prejudicial to Appellant.

Appellant next makes several interrelated claims. The crux of Appellant's challenges regarding the two remand hearings as well as that of several specifically enumerated issues in his original brief to this court is that the prosecution deliberately withheld crucial information in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) with

that Appellant wanted him to call Wakshul. (N.T. 7/1/82 pp. 33–34). The court found that it was Appellant's personal decision to call Mr. Wakshul, against the judgment of Mr. Jackson. The court also found Mr. Jackson's trial statements, rather than his PCRA hearing testimony, to be the more credible account.

respect to several key witnesses. Those challenges involve claims of intimidation or coercion against witnesses to alter their testimony and/or promises of economic or penal benefits in exchange for favorable testimony. Respecting virtually all of these witnesses, it is Appellant's contention that these tactics were employed to thwart the defense theory that the real shooter fled the scene before back-up police arrived and that this evidence constitutes "newly discovered evidence" because the prosecution withheld this evidence from the defense.

In *Brady,* the United States Supreme Court held that the prosecution's suppression of evidence favorable to an accused, when requested, is a violation of due process where that evidence is material either to guilt or punishment, irrespective of the good or bad faith of the prosecution. *Id.* at 87, 83 S.Ct. 1194. In analyzing similar claims, this court has previously held that where a general request for exculpatory evidence is made, the evidence is material only "if the omitted evidence creates a reasonable doubt that did not otherwise exist." *Commonwealth v. Green,* 536 Pa. 599, 640 A.2d 1242 (1994), citing *Commonwealth v. Moose,* 529 Pa. 218, 602 A.2d 1265 (1992).

As noted above, at the time of the filing of Appellant's PCRA petition, section 9543(a)(2)(vi) provided for post-conviction relief where a petitioner could prove a claim of newly discovered exculpatory evidence. In order to succeed on such a claim, the petitioner must establish that: (1) the evidence has been discovered after the trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) such evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) such evidence would likely compel a different verdict. *Commonwealth v. Schuck,* 401 Pa. 222, 164 A.2d 13 (1960); *Commonwealth v. Williams,* 537 Pa. 1, 24–26, 640 A.2d 1251, 1263 (1994).

Initially, Appellant focuses on the testimony of Robert Chobert, one of the three eyewitnesses to the shooting. He claims that during the months prior to trial, Chobert repeated-

ly changed his testimony in ways favorable to the defense. Appellant submits that through the ineffective assistance of counsel, prosecutorial misconduct and improper trial rulings, he was precluded from establishing Chobert's incentive to favor the prosecution.

Chobert, a cab driver, testified at trial that, on the morning of the shooting, he was stopped at the corner of 13th and Locust Street after having let a fare off when he heard a shot. As he looked up from his paperwork, he saw an officer fall to the ground. Appellant was standing over the fallen officer, firing shots at him. (N.T. 6/19/82 pp. 209–210). After that, he witnessed Appellant walk back from the officer a distance of approximately ten feet and then fall by the curb. (N.T. 6/19/82 p. 211). He identified Appellant at the scene of the shooting and gave a statement that morning concerning his observations. In that statement, Chobert claimed that he saw Appellant run approximately thirty steps after shooting the officer, but then fall; he also saw another man run, but get only a half block away before the officers arrived and stopped him. (He gave a similar statement on December 12, 1981). Appellant submits that additional trial testimony establishes that Chobert told an investigator at the scene that the "shooter ran away." (Brief of Appellant at p. 39). Appellant refers specifically to the testimony of Inspector Giordano who testified at trial as to his observations upon arrival at the scene just moments after the shooting. Giordano testified that he encountered Chobert who told him "that the man that shot the policeman ran away, and he was a MOVE member." When Giordano asked Chobert what he meant by a "MOVE member," Chobert responded, "he had the hair, the funny hair." At that point, someone mentioned that the man being described was in the back of the police wagon, whereupon Chobert proceeded to the wagon and identified Appellant as the shooter. (N.T. 6/1/82 pp. 70–71).

Chobert was called as a defense witness during the PCRA proceedings. It is Appellant's contention that Chobert's initial statements to the police support the defense theory that the true shooter fled the scene and that testimony at the PCRA

proceedings established that Chobert's trial testimony to the contrary had been manipulated by a previously undisclosed promise of the prosecution to assist Chobert in securing his driver's license which, at that time, was under suspension. Also, it is contended that Chobert was biased in favor of the prosecution due to his probationary status at the time of trial.[20]

Appellant's current contention, that Chobert initially claimed the shooter "ran away," is a misrepresentation of the testimony. As noted above, his initial statements include only the fact that the shooter ran some distance before falling. The testimony elicited from Giordano is not inconsistent with these statements; instead it is simply not as complete as Chobert's formal statements.

Also, contrary to Appellant's assertions, the record reveals that no promise was offered by the Commonwealth to Mr. Chobert regarding his license. Mr. Chobert testified at the

**20.** Prior to the initiation of cross-examination of Chobert at trial, a side bar conference was held to determine whether the defense was permitted to question Chobert regarding his prior record for arson; a crime for which he remained on probation at the time of trial. During this conference, the defense argued that because the witness had been paid for committing this arson, such conviction qualified as *crimen falsi* and the defense should, therefore, be permitted to cross-examine the witness as to that crime. The trial court ultimately ruled that arson did not qualify as *crimen falsi* and, accordingly, precluded the cross-examination. Appellant now claims that such ruling was in error. In support thereof, he claims that the conviction could have been used to establish bias of the witness given his probationary status. He argues both trial court error in not allowing the questioning for purposes of establishing bias and trial counsel's failings for not pursuing such a claim. Appellant implies that, notwithstanding the fact that the defense specifically offered this evidence only to impeach credibility, the court should have recognized the value of this evidence in exposing alleged bias. The trial court, however, had no duty to present Appellant's case. Moreover, at the time of trial, the law allowed evidence tending to show bias only where there was a pending indictment and the prosecutor's ability to grant leniency. *See, Commonwealth v. Coades,* 454 Pa. 448, 311 A.2d 896 (1973). It was not until 1986 when this area of the law was expanded to allow questions tending to show that the witness may expect leniency even absent any such promises on an outstanding charge. *See, Commonwealth v. Evans,* 511 Pa. 214, 512 A.2d 626 (1986). In any event, there were no pending charges against Chobert to which this rule of law would have applied.

PCRA hearing that his driver's license was suspended in December 1981 and that at some point during trial, he had asked the prosecutor if he could assist him in ascertaining how to get his license back. He testified further that although the prosecutor assured him that he would look into the matter for Mr. Chobert, that the prosecutor never contacted him again regarding this matter. Indeed, he admitted at the PCRA proceedings that, as of then, his license had still not been restored. (N.T. 8/15/95 pp. 3–20). Appellant offered no additional evidence which would contradict Chobert's assertions that no such deal existed. Moreover, the PCRA court specifically found Chobert's PCRA testimony to be credible. Accordingly, since the record amply supports that finding, we are bound thereby. *Beasley, supra.* Finally, Mr. Chobert's pretrial statements, which were consistent with his trial testimony and which were introduced by the Commonwealth, were made prior to this supposed "deal."

██ Appellant contends that the Commonwealth also failed to disclose favors given to prosecution witness Cynthia White. Cynthia White testified at trial that on December 9, 1981, shortly before 4:00 a.m., she witnessed Appellant shoot Officer Faulkner. Her testimony revealed that she was standing on the corner of 13th and Locust when she observed a police car stopping a Volkswagen vehicle. After both the officer and the driver of the Volkswagen had alighted from their vehicles, she saw them speak and then observed the occupant of the Volkswagen strike the officer in the cheek and observed the officer turn that individual as if to handcuff him. At that point, she saw Appellant run from an adjacent parking lot and, as he reached the curb, shoot the officer in the back. According to her testimony, as the officer was staggering, he seemed to be reaching for something. After the officer had fallen to the ground, she saw Appellant stand over the officer and shoot several more times. (N.T. 6/21/82 pp. 4.92–4.94, 4.105).

While Appellant admits that Ms. White was cross-examined at trial respecting her extensive criminal record, which consisted mainly of prostitution charges, in an effort to attack her

credibility, he claims that the trial court improperly barred the most critical evidence of her alleged bias. Specifically, Appellant claims that the court barred another prostitute, Veronica Jones, from testifying that police told her that Ms. White received favors for her testimony and that Ms. Jones could receive similar favors if she implicated Appellant in this murder.

Jones, too, was present in the area of the shooting and had given the police a statement on December 15, 1981 wherein she, in pertinent part, noted that she was standing on a corner in the vicinity of Locust and 12th streets when she heard several shots. She then looked down Locust Street and saw an officer falling to the ground. She stated that she then saw "two black guys walk across Locust Street and then they started sort of jogging." At trial, she testified consistent with this statement except for that portion of the statement wherein she indicated she saw two men jog away. At trial, she specifically denied that she saw two men jogging; claiming instead that she only saw two men standing near the fallen officer and that she then left the scene. (N.T. 6/29/82 pp. 109–114). Moreover, she admitted at trial, that on December 15, 1981, at the time she gave the statement, she was a "half a nickel bag high." (N.T. 6/29/82 p. 122).

Significant to Appellant's current claim, it was revealed during Jones' trial testimony that she, along with some other persons, was taken to the police station sometime in early January, 1982 on unrelated matters. She testified that while at the station, a conversation ensued regarding the instant case during which the police "were getting on [her] telling [her] she was in the area and [had] seen Mumia, . . . do it . . . intentionally. They were trying to get me to say something that the other girl said." (N.T. 6/29/82 p. 129). She denied being actually interviewed at that time, testifying instead that the police were "more so conversating [sic] among each other" and that she assumed that they expected her to say "something in their behalf," but that she could not do so because she "just saw what [she] saw." (N.T. 6/29/82 pp. 131–132). When trial counsel sought to further question Jones regarding this

event, the prosecution objected. At sidebar, defense counsel claimed he was unaware of this incident prior to Jones' testimony and that he would like to question Jones further as to any possible statements she may have made while at the police station in January, 1982. Defense counsel was then given the opportunity to confer with Jones after which he informed the court that if permitted, Jones would testify that the police told her and the others who were with her that if they would give statements similar to that given by Cynthia White regarding the night of the shooting, they could work the streets without interference. An objection to this line of questioning was ultimately sustained and this latter statement was never heard by the jury. (N.T. 6/29/82 pp. 142–145).[21] Appellant contends that the Commonwealth's failure to disclose this interview of January, 1982, the favor offered to Jones and the favor offered to Cynthia White, violates the doctrine of *Brady* that evidence tending to impeach the credibility of witnesses must be disclosed.[22] For the following reasons, this claim warrants no relief.

First, there was no evidence presented of any such "deals" or "favors." Moreover, at the original PCRA hearing, where Appellant first made this claim, the defense did not offer the testimony of either White or Jones, nor did it offer the testimony of the officers present during this alleged "interview." Our discussion of this matter is, however, not yet

21. Appellant asserts that the trial court's ruling precluding further questioning of Jones regarding this alleged conversation in January 1982, was improper. However, Appellant offers no argument in support thereof. It appears from a reading of the record that the court's ruling was, at least in part, based upon finding that this line of questioning was irrelevant since the proffer regarding Jones' testimony was only that she would testify as to what she saw on December 9, 1981. In its opinion following the remand hearing, the court noted that this additional questioning was not permitted since the witness had already testified concerning this conversation of January, 1982. Appellant subsequently claimed in his brief following the remand hearing which specifically involved this issue regarding Jones, that the court's ruling prejudiced him. However, as discussed *infra*, no such prejudice has been established.

22. Appellant also asserts that counsel was ineffective in failing to interview Jones prior to her testimony presumably because such an interview would have revealed this "critical" evidence.

complete. The purpose of the supplemental hearing on the first remand in this matter was to provide Appellant the opportunity to prove, as alleged, that the defense had just recently located Jones, and that they had evidence to establish that the police badgered and harassed Jones both in January 1982 and immediately before she took the stand at trial in June, 1982.[23] Her testimony at this supplemental hearing was that, as a result of the badgering, she lied at trial and said that she did not see anyone running at the scene, when in fact, as she said in her statement of December 15, 1981, she did see someone running.[24]

Following this hearing, the PCRA court explicitly found Jones' testimony to be incredible and, accordingly, concluded as well that such testimony was not likely to have altered the verdict and thus, did not establish the fourth factor necessary to meet the test for "after-discovered evidence." [25] [26] The

**23.** It was never alleged at the original PCRA hearing that Jones was unavailable to testify or even that the defense was looking for Jones but unable to locate her.

**24.** Appellant submits that the intimidation tactics of the prosecution reached new heights during this hearing. Appellant points specifically to the fact that while testifying, Jones was arrested by New Jersey authorities on an outstanding warrant. Appellant does not argue, nor does it appear to be, that the warrant was not a valid one. In any event, this incident has no bearing on the merits of Appellant's claim for relief since Jones did not alter her testimony as a result of that arrest. Thus, Appellant was not prejudiced thereby.

**25.** In conjunction with this finding, the court ruled that Jones' testimony should not, therefore, be added as a supplement to the record of the PCRA proceedings. Appellant takes issue with this particular ruling, claiming that it flouts this court's order which directed that such evidence be added to the record. Appellant's claim here is of no moment. While, indeed, there was no request by Appellant, nor a directive of this court, for the PCRA court to determine whether this allegedly "newly discovered evidence" should be added to the record, the court's ruling to that effect simply reflects the court's legal conclusion that the evidence does not constitute "after-discovered evidence." In any event, the PCRA court properly complied with this court's order and the testimony from this supplemental hearing has been made part of the record.

**26.** Appellant submits that the PCRA court applied the wrong legal standard here insofar as his claim regarding Jones was not that her testimony constituted "after-discovered evidence" but rather that this evidence of police coercion constituted undisclosed *Brady* materials.

court further concluded that, even assuming her testimony was believed, that testimony would still not be likely to alter the verdict.

In support of its ruling, the court, after reciting the above-referenced trial testimony and sidebar discussion, noted the following:

> At the remand hearing on October 1, 1996, Veronica Jones stated that her testimony at the trial in June of 1982 was truthful, except when she testified that she "didn't see two men leave the, umm, run away, leave the scene." The change in her testimony, Ms. Jones stated, was due to two detectives who visited her in jail and promised to help her with her charges if she helped them. Ms. Jones described the meeting with the detectives as follows:
>
>> It was just more so that, umm, I was to name Mr. Jamal (indicating) as the shooter, you know. And if I was to do that, I was supposed to do something like this girl named Lucky White. They said we made a deal with her and it was going to work out for her so they could make it work out for me. All they kept expressing was don't forget five to ten years, that's a long time. They kept expressing that point. So flashback my kids, that's all I think about is my kids. (10–1–96 N.T. at 24).
>
> As noted above, the witness testified at trial to a similar encounter with uniformed police officers in January of 1982 who asked her to identify the defendant as the shooter at the trial. Consequently, the testimony of Ms. Jones, was that on two occasions police/detectives promised favorable treatment if she would identify the defendant as the shooter. However, despite these promises or threats, as she described them, she did not identify the defendant as the

Appellant's application to this court requesting the remand indicated that Jones was a "newly available witness." Thus, it seems apparent that Appellant's claim, at least originally, was, indeed, one of "after-discovered evidence." In any event, the PCRA court did, indeed, analyze this claim under the rule of *Brady*, concluding that no *Brady* violation had been established since none of the accounts of the incident testified to by Jones qualified as material exculpatory evidence.

shooter. The promises or threats caused her to only deny seeing two men running away. (10-1-95 N.T. at 70.)

This Court finds it remarkable that one who decides to testify falsely as a result of a deal with the police for favorable treatment would testify to other efforts by police personnel to get her to change her testimony and, in addition, not testify in the fashion requested by the police.

There are, however, other aspects of Ms. Jones' testimony which are incredible. At the remand hearing, Ms. Jones related the circumstances of her encounters with the police and detectives when they sought her cooperation in identifying the defendant as the shooter. (See 10-1-96 N.T. at 37–39 and 45-46). Despite remembering the details of these alleged encounters, including the fact that she was asked to identify the defendant as the one who shot the police officer, she could not remember whether she told the police that she would or would not go along with the plan.

Prior to testifying, Veronica Jones met with a member of the Philadelphia Public Defender's Office who counseled her on whether her testimony had Fifth Amendment implications. Following that interview and before the witness testified, the Defender advised this Court in the presence of defense counsel and the prosecutor that he had spoken to Ms. Jones and reviewed her statement and there were no Fifth Amendment problems. (6-29-82 N.T. at 92-94).

Ms. Jones testified at the remand hearing that she was brought into the courtroom to testify at trial without being told that she was to be a witness in the defendant's case. As she described it, she "was scared and ... didn't know what was going on. I wasn't ready." (10-1-96 N.T. at 21).

Yet at the defendant's trial, before Ms. Jones was called as a witness, the following transpired:

THE COURT: Let the record indicate that we are here in chambers.

Give us your name?

MR. ROSIN: David Rosin of the Public Defenders Office.

THE COURT: And you represent whom?

MR. ROSIN: Veronica Jones. Louise Tatum.

THE COURT: Mr. Jackson wants to call your client as a witness in this case.

MR. ROSIN: I have spoken to my client and I have seen her statement. I see no Fifth Amendment problem with her in testifying to what she saw. (06–29–82 N.T. at 93–94).

Then, while testifying Ms. Jones was questioned as follows:

BY MR. JACKSON: Did they have Dreadlocks?

I can't say. Like I told my public defender I was too far to say that they had Dreadlocks. (6–29–82 N.T. at 111).

Thus, it is clear that Ms. Jones had the opportunity to consult with counsel, discussed her statement and proposed testimony and was advised of her Fifth Amendment rights. When asked at the remand hearing if she had met with an attorney the day that she testified she responded, "I don't, I don't remember. I don't remember." (10–1–96 N.T. at 69).

Although Veronica Jones testified at trial that she had only signed one blank sheet for the detectives who interviewed her on December 15, 1981, at the remand hearing she acknowledged that she did sign each page of the statement she gave to the detectives. (10–1–96 N.T. at 77). She also acknowledged that the statements she gave were truthful based on what she remembered from the night of the incident.

In her statement as indicated above, Ms. Jones appears to describe two men jogging across Locust Street, toward the fallen officer. However, in her testimony at the remand hearing, she refutes that and claims that she meant they were running away. (10–1–96 N.T. at 85). Nevertheless, her testimony reveals that whatever she saw occurred after the police officer and defendant had been shot and the incident was over. Ms. Jones testified that she was leaning on the railing of the High Speed Line entrance. That after hearing shots around the corner on Locust Street, she waited "a few minutes" until after the shooting and stopped

and looked around the corner. (10–1–96 N.T. at 94). Thus, in spite of the fact that Ms. Jones gave a statement shortly after the incident describing two men jogging across Locust Street to within two or three steps of the fallen officer, her claim that the men were actually running away from the scene is of no moment. Eye-witness testimony at the trial established that the defendant was wounded and sitting on the curb a short distance from the fallen officer when Ms. Jones would have peered around the corner. Whether two men were running towards the officer or away from the officer, it is clear the incident between the officer and the defendant was over when Ms. Jones made her observations. The defendant was found sitting on the curb a few feet away from the police officer he had shot to death. Defendant's emptied gun was found nearby. Eyewitnesses independently identified the defendant as the shooter. Defendant boasted in front of witnesses that he had killed the officer. Defendant's brother who was on the scene throughout the incident never mentioned a killer running away but stated to police arriving on the scene, "I ain't got nothing to do with this." (6–19–82 N.T. at 155).

(Op. of Sabo, J. dated Nov. 1, 1996, pp. 7–12).

 Traditionally, issues of credibility are within the sole domain of the trier of fact since it is the trier of fact who had the opportunity to personally observe the demeanor of the witnesses. *Commonwealth v. Farquharson*, 467 Pa. 50, 59–61, 354 A.2d 545, 550 (1976); *Commonwealth v. McCracken*, 540 Pa. 541, 543–544, 659 A.2d 541, 546 (1995). Additionally, the law regards recanting testimony such as that presented here as exceedingly unreliable. Indeed, this court has commented that "there is no less reliable form of proof, especially when it involves an admission of perjury." *Commonwealth v. Anderson*, 466 Pa. 339, 342, 353 A.2d 384, 386 (1976). Just as with any other credibility determination, where the record supports the PCRA court's credibility determinations, those determinations are binding on this court. *Beasley, supra.*

■ Our review of the record reveals ample support for the court's findings as set forth above. Moreover, even assuming the truth of Jones's PCRA testimony, we cannot conclude that Appellant has proven a *Brady* violation. Her testimony reveals that she was almost a block away, and that after hearing the shots, she did not even look in the direction of the shooting for a few minutes because she was afraid. In addition, contrary to the assertions of the defense, her December 15, 1981 statement does not even mention someone "fleeing from the scene." Rather, she stated only that she saw two persons jogging, presumably away from the fallen officer. Accordingly, testimony to that effect would do little to support the defense theory that the true shooter fled the scene. Also, the jury heard her claim during her original trial testimony, that police tried to get her to implicate Appellant when she was taken to the station in January 1982. Finally, she never portends to have witnessed the actual shooting. Accordingly, there is nothing exculpatory about her statement. Thus, this claim warrants no relief. *See, Green,* supra.

■ Continuing with his claim that the prosecution violated the dictates of *Brady,* Appellant next contends that the prosecution withheld evidence of its attempted intimidation of key defense witness, Dessie Hightower, whose trial testimony supports Appellant's theory that the true shooter fled the scene before backup police arrived. Hightower testified at trial that as he and his friend were walking towards their car, they heard gunshots being fired and shortly thereafter, saw someone wearing a red and black sweater running in a direction opposite the site of the shooting. (N.T. 6/28/82 pp. 28.122–126). This testimony was consistent with two prior statements he had given to police. The defense called him to testify at the PCRA hearing for the purpose of establishing that he had taken a polygraph examination at the behest of the police. It is Appellant's contention that Hightower was subjected to this polygraph for the purpose of intimidating him. In support thereof, Appellant submits that PCRA testimony establishes that Hightower was the only witness subjected to a polygraph; that the results of that polygraph show

that he was telling the truth; and that during the polygraph, he was not even asked about whether he saw someone run from the scene. Appellant contends that the prosecution withheld all of these facts from the defense.

At the PCRA hearing, Hightower testified that he was told by the person administering the polygraph that he had passed the test and that he did not remember the person ever telling him during the test that the results indicated he was lying. (N.T. 8/3/95 pp. 27, 71). However, Lieutenant Craig Sterling, the detective who administered the polygraph to Hightower, testified that the test revealed, and that he so told Hightower, that he had not been telling the whole truth about the shooting. (N.T. 8/4/95 p. 124). It appears that the test revealed that Hightower was not being truthful when he was asked whether he saw a gun in Appellant's hand on December 15, 1981 and he answered "no." (N.T. 8/3/95 p. 66).

During his PCRA testimony, it was also revealed that in a statement given to defense investigator, Robert Greer, on May 3, 1982, Hightower said:

I heard shots go off. Maybe three or four, probably two or three seconds in between. I walked back and peeped from behind the wall. I couldn't see anything. I didn't hear any more shots going off, okay. So I walked towards Whispers, and by then it was flooded with other police officers. I saw somebody running past the hotel.

(N.T. 8/3/95 p. 46). When presented with this statement, Hightower quickly offered that the statement was somewhat out of sequence with the events he actually witnessed. He testified that he actually saw this "someone" running before the other officers arrived. (N.T. 8/3/95 p. 46).

The PCRA court found Hightower's PCRA testimony to be not credible. In support thereof, the court noted that it found Lieutenant Sterling's testimony credible and Hightower's not credible respecting the issue of whether Hightower was told he passed the polygraph; that Hightower's demeanor suggested he was not credible; and that Hightower's PCRA account of the "fleeing person" was inconsistent with the one he gave

to Greer on May 3, 1982. Apparently, the court did not credit Hightower's attempted clarification of this May 3, 1982 statement.[27] As a reviewing court, and given the record support for the court's findings, we cannot second guess the PCRA court's determination respecting Hightower's lack of credibility. *See, Beasley, supra.* Accordingly, Appellant has failed to establish his claim here that there was material and exculpatory evidence withheld by the prosecution regarding Hightower.

Appellant's argument continues with a claim that the police destroyed at least two exculpatory statements taken from another eyewitness, William Singletary, and threatened to cause him physical harm and to destroy his business if he did not cooperate and say what the police wanted him to say. Appellant asserts that the defense did not know about Singletary's true account of the shooting.

Singletary testified at the PCRA hearing that he was a witness to the shooting. According to his testimony, he went to the police station shortly after 4:00 a.m. on December 9, 1981 whereupon he was interviewed by someone named Detective Green. (N.T. 8/11/95 p. 209). Singletary testified that while being interviewed, he was asked to write a statement respecting his observations of the shooting incident. He testified that he attempted to complete two or perhaps three such statements, but that after each statement was complete, the detective read it and then ripped it in pieces and threw it in the trash. Detective Green then told Singletary to write what Detective Green wanted him to write or else he would be beaten and his business would be destroyed. Accordingly, Singletary then wrote what the detective dictated and after that statement was typed, Singletary signed it. (N.T. 8/11/95 pp. 210–212). The substance of that statement was that as he was stopped at a red light at 13th and Locust Streets, he heard what he initially thought to be firecrackers, but soon realized it was not firecrackers because they were going too

27. In any event, Appellant is unable to establish prejudice on this point, since the jury heard his testimony to the effect that he saw someone running prior to the time the other officers arrived and obviously found the evidence to the contrary to be more credible.

fast. He looked down Locust Street and saw a police car parked at the curb. He then parked his own vehicle and exited it. He proceeded to the southwest corner of 13th and Locust from where he observed two figures some twenty-five to thirty feet away. One was standing facing the wall; the other with his back to the wall, bent over at the waist. As he began to walk towards these two figures, someone yelled to him that a policeman had been shot. He then saw a policeman sitting on the ground with his back against the wall with his blood covered right hand to his face. The other person, an African–American man with dreadlocks and wearing green pants, was sitting on the curb, holding his leg that was stretched in front of him. After the fallen officer was placed in a police car and transported elsewhere, Singletary encountered Officer Vernon Jones with whom he was familiar. Officer Jones directed that Singletary proceed to the police station and report what he had observed. (N.T. 8/11/95 pp. 245–249).

Singletary testified that a few days after he gave his statements, he contacted State Representative Alphonso Deal and informed him of the coerciveness he encountered, but that, to his knowledge, Representative Deal never initiated an investigation into his complaint. (N.T. 8/11/95 pp. 214, 251). He also testified that a few days later, four officers came to the gas station which he managed, claiming they were on burglary detail. Singletary, his employees, and his customers were told to lie on the ground while the officers displayed their weapons. Singletary claims that one of the officers said "this will give you something to remember." (N.T. 8/11/95 pp. 218–219). He testified that in February, 1982 he was forced to close his business because of repeated instances of vandalism. (N.T. 8/11/95 pp. 219–223).

At the PCRA hearing, Singletary testified that what he actually witnessed, and what he wrote in the discarded statements, was that he saw an officer frisking the driver of the Volkswagen. He claims a passenger, a tall man with dreadlocks, alighted from the Volkswagen, screaming and yelling, and then pulled a gun and shot the officer. The passenger placed the gun in the Volkswagen and fled. The driver ran

after the passenger. Singletary then observed Appellant approach the fallen officer, asking him if there was anything he could do to help the officer. As Appellant was bending forward, the officer's gun discharged and struck Appellant. (N.T. 8/11/95 pp. 234–237). Singletary also testified that when the police arrived, they repeatedly beat and kicked Appellant and, at one point, rammed his head into a police car with enough force to fracture his skull. (N.T. 8/11/95 pp. 237–238).[28]

According to his testimony, Singletary gave a statement to one of Appellant's current attorneys on August 31, 1990. In that statement, Singletary stated that after Appellant offered to help the officer, the officer mumbled something that sounded like "get Maureen" and/or "get the children." (N.T. 8/11/95 pp. 269–271). In another part of that deposition, however, he also said that after Appellant asked if he could help the officer, the officer said nothing and "just laid back, grabbed his gun and fired." (N.T. 8/11/95 p. 276). When confronted by the prosecution with this inconsistency in his December 1990 statement, Singletary claimed to have been confused by the questions being posed at the time of his statement. (N.T. 8/11/95 p. 278).

To counter Singletary's PCRA testimony, the prosecution presented the testimony of Police Detective Quinn, who claimed that he, and not a Detective Green, took Singletary's statement at the time of the murder. He recalled having been asked to leave his post at the North Central Detective Division and go to the Homicide Unit to assist. (N.T. 8/14/95 p. 49). He testified that he typed Singletary's statement verbatim and that at no point was Singletary asked to write anything. (N.T. 8/14/95 pp. 51–52). Quinn testified that he did not recall who

28. There was testimony presented at trial by Anthony V. Coletta, M.D., the treating physician at the hospital to which Appellant was transported after the shooting, to the effect that Appellant's injuries to his face were not consistent with having been beaten with a blackjack or night stick. (N.T. 6/28/82 p. 28.100). Dr. Coletta testified that other than the bullet wound, Appellant suffered the following injuries: a laceration to his forehead of approximately four centimeters; swelling over the left eye; a laceration of his lip; and soft tissue swelling on the right side of his neck and chin. (N.T. 6/28/82 p. 28.58).

directed him to take Singletary's statement, but that during the taking of that statement, no one but he and Singletary were present. (N.T. 8/14/95 pp. 50, 67). He testified that to his knowledge, no other detectives interviewed Singletary. However, he admitted that he not know how long Singletary was at the station that day. (N.T. 8/14/95 pp. 52, 67–68).

Officer Vernon Jones testified that he saw Singletary, with whom he was familiar, at the scene and that Singletary asked him what had happened. (N.T. 8/14/95 pp. 18–19). According to Jones, when he told Singletary that a police officer was shot, Singletary responded that he heard shots, but believed them to be firecrackers and that after that several police cars arrived. (N.T. 8/14/95 p. 21). When Jones asked Singletary whether he had seen the shooting, Singletary replied "no." *Id.* Jones had recorded this precise account in a statement given to homicide detectives on December 17, 1981. He candidly admitted at the PCRA that he had no present recollection of these events, but was certain his recorded statement was true. (N.T. 8/14/95 pp. 20, 29).

The PCRA court found Singletary's testimony not credible. We find ample support in the record for this conclusion and, thus, will not overrule that finding. *Beasley, supra.* Accordingly, Appellant's claim which is based on Singletary's testimony lacks merit.

■ Appellant next contends that the prosecution withheld favorable testimony of several witnesses. The first specific claim focuses on Deborah Kordansky, who allegedly also saw someone fleeing, and who was unavailable at trial allegedly due to the prosecution's deliberate withholding of her address and phone number. Kordansky, who, at the time of the murder, lived in an apartment located at 13th and Walnut Streets from where she could overlook the scene of the shooting, gave a statement to police on December 9, 1981. Her testimony at the PCRA hearing, which was consistent with that statement, was that between 3:45 and 4:00 a.m. on that date, she heard several shots that she thought were firecrackers, and then heard sirens. (N.T. 8/3/95 pp. 232, 235).

534

When she heard the sirens she looked out her window, saw some eight to ten police vehicles and saw someone running down the street. (N.T. 8/3/95 p. 240). She was questioned extensively respecting the sequence of events to which she was testifying, and remained steadfast that at the point that she saw a person running, the police had already arrived on the scene. Contrary to Appellant's contentions, trial counsel did contact Kordansky by phone during the time of trial. Kordansky told counsel during that conversation that she doubted she could be of assistance to the defense. (N.T. 8/3/95 pp. 210–212).

The PCRA court concluded that Kordansky's testimony could not have aided the defense and that, therefore, trial counsel was not ineffective in failing to secure her testimony at trial. We agree. Her testimony is simply not corroborative of the defense theory that the true shooter fled the scene since her testimony places someone running well after the police and emergency vehicles had arrived on the scene. Accordingly, even assuming the truth of Appellant's claim that he was unable to locate Kordansky at the time of trial due to the prosecution's actions, that claim would not provide PCRA relief since Kordansky's testimony was not material. *See, Green, supra.*

Appellant next claims that the true statements of an alleged suspect, Arnold Howard, were not disclosed to the defense. Howard was questioned by police on December 9, 1981 because an application for a duplicate operator's license bearing his name was found in Officer Faulkner's pocket. Howard maintained that he knew nothing about the murder; was not present in the vicinity of the shooting; and that he had lost the driver's license application in William Cook's Volkswagen on November 30, 1981 when Cook had provided him a ride. He was not called to testify at trial.

At the PCRA hearing, Howard was called by the defense in an effort to establish that he had actually been taken into custody within several hours of the murder and told that police suspected he was at the scene of the shooting and was the person witnesses said fled. Howard testified that he had

known Appellant virtually all of his life and that they grew-up in the same neighborhood. Respecting the shooting incident, he testified that he was in custody for some 72 hours during which time he was made to appear in a line-up; photographs were taken of him; and "some kind of powder was put on his hands." (N.T. 8/7/95 pp. 5–8). He testified that also in the line-up was a neighborhood friend of his, Kenneth "Poppy" Freeman, to whom he had loaned his driver's license. He testified that Freeman was a partner of Appellant's brother, William Cook, in a vending stand operation where Howard himself sometimes worked. Howard also claimed he saw a person known to him as "Sweet Sam," an alleged pimp in the Center City area of Philadelphia, also being held by police. Howard testified that he witnessed "Sweet Sam" being escorted away by two men in suits and that he never saw "Sweet Sam" again. When asked, Howard identified "Sweet Sam" as Cynthia White's pimp. Howard also testified that Freeman was selected from the line-up by an African American woman seated behind the glass. Freeman, according to Howard's testimony, died in either 1993 or 1994 after allegedly being handcuffed and "shot-up" with drugs. (N.T. 8/7/95 pp. 9–22).

On cross-examination, it was revealed that Howard had prior convictions for burglary, theft by receiving stolen property, and forgery, and that he was then on probation. (N.T. 8/9/95 pp. 27–30). When confronted with a statement purported to be one he gave the police on December 9, 1981, Howard admitted that he had given a statement; admitted that the statement being offered at the hearing bore his signature on 4 of the 5 pages; and admitted the truth of some of the substance of the statement, but specifically refuted a majority of the statement. (N.T. 8/9/95 pp. 64–75, 83–98). Howard was also shown a page purportedly taken from the logbook located in the front entrance of the Police Administration Building. The page was dated December 9, 1981, and included on one line, the witness' name and indicated a "time-in" of 12:30 and a "time-out" of 2:30.[29] Howard testified that he had no recollection of this piece of paper. (N.T. 8/9/95 pp. 95–98).

29. We note that the time indicated in the log book apparently did not include a reference to either a.m. or p.m. However, the sheet was

In rebuttal to Howard's testimony, the prosecution called Captain Edward D'Amato, who testified that he took Howard's statement on December 9, 1981. He stated that Howard appeared at the interview voluntarily and that he was not handcuffed. According to D'Amato, the interview was conducted at the Police Administration Building and lasted from 12:30 p.m. until 2:30 p.m. He stated that he typed the statement verbatim and that Howard was given a completed copy to review and sign. (N.T. 8/11/95 pp. 117–130).

The prosecution also presented the testimony of Officer Joseph Brown, who was the custodian of the sign-in-book at the Police Administration Building. He verified the log dated December 9, 1981 and testified that persons who are handcuffed are not brought into the building through the entrance where this log book is located and are not required to sign the log book. (N.T. 8/11/95 pp. 65–70).

The PCRA court found Howard's testimony to be incredible. In support thereof, the court relied upon the testimony of Howard, and Officers D'Amato and Jones; the fact that Howard had prior *crimen falsi* convictions; as well as Howard's demeanor. The court specifically found the testimony of the officers to be credible. Our review of the record reveals ample support for the PCRA court's credibility determinations and we are bound thereby. *Beasley, supra.* Given those findings, we conclude that Appellant has failed to prove he is entitled to relief on this claim.

 Next, Appellant focuses on the testimony of one William Harmon whom the defense contends they just discovered during the midst of the PCRA proceedings. At that time, Harmon was incarcerated at the State Correctional Institution (SCI) at Mercer on drug charges. He testified that he contacted his attorney and asked him to contact Appellant's lawyers to inform them that Harmon had been a witness to

dated December 9, 1981 and since it is undisputed that Howard was interviewed following the shooting which occurred at approximately 4:00 a.m, we find that Judge Sabo's conclusion that the time entries at issue necessarily refer to 12:30 p.m. and 2:30 p.m., is sound.

the shooting on December 9, 1981. (N.T. 8/10/95 p. 48).[30] On August 3, 1995, Harmon was visited in prison by counsel for Appellant to whom he provided an affidavit. He was then transported to Philadelphia on August 9, 1995 and after being interviewed by counsel for the Appellant on the morning of August 10, 1995, he was directed by the court to testify.[31]

In that affidavit, and in his PCRA testimony, Harmon claimed to have been in a restaurant on 13th Street at approximately 3:30 a.m. on December 9, 1981. While in the restaurant he saw Appellant, with whom he was familiar, on the sidewalk outside and quickly left to talk to Appellant. While outside, the two men heard loud arguing whereupon Appellant began to walk through a parking lot towards the noise and Harmon followed. At that point, Harmon heard a shot and when he looked in the direction where he heard the shot, he saw an officer fall. According to Harmon, the officer was laying with his back against a wall with his gun visible. While Harmon stopped walking when he heard this shot, Appellant continued in the direction of the fallen officer. Harmon then heard a second shot and saw Appellant fall. Harmon claimed to have seen someone running down Locust Street in the direction of 12th Street after the first shot was heard. Then, shortly after hearing the second shot and seeing Appellant fall, Harmon saw a car pull up, someone alight from that car and shoot the officer again, and then get back into the car and drive off. (N.T. 8/10/95 pp. 55–68). Harmon ex-

30. According to his PCRA testimony, Harmon did not testify at trial because his mother asked him not to become involved. He claimed to only now be testifying at the PCRA hearing because his mother had since died.

31. At the start of the hearing on August 10, 1995, defense counsel requested a further delay so that Harmon could refresh his recollection with photographs that the defense claimed would not be available for several days. Following the lunch recess, the court directed that subject photographs be produced. After giving the witness the opportunity to view those photographs, the court, over the continued objection of the defense, directed Harmon to testify. After the photographs had been produced, defense counsel requested another continuance, arguing for the first time that Harmon was too tired to testify as he had been afforded only a wooden bench to sleep on after his arrival the night before in Philadelphia. The court, in its findings of fact, determined that these tactics were designed solely for the purpose of delay.

plained that, because he was a pimp and did not want to get involved with the police, he then fled the scene. (N.T. 8/10/95 pp. 70–71). Significantly, when questioned on cross-examination, Harmon stated that Officer Faulkner was facing the man who first shot him. (N.T. 8/10/95 pp. 92–93). Physical evidence, however, proved to the contrary; that Officer Faulkner was shot from behind. (N.T. 6/25/82 p. 8.167; 6/26/82 p. 15).

The PCRA court found Harmon's testimony to be "absolutely incredible." In support thereof, the court cited not only his entire testimony, but also his demeanor, and defense counsel's obvious attempt to delay his testimony. We find support in the record for this conclusion; especially in light of the fact that Harmon's account of the shooting is at odds with virtually all of the other eyewitness testimony and since it was the PCRA court which personally observed his demeanor. As such, that finding of credibility is binding on this court. *Beasley, supra.* Additionally, we point out that Appellant offered no proof whatsoever of Harmon's unavailability at the time of trial nor of any efforts made to locate Harmon. Certainly, Appellant would have been aware of Harmon since Harmon testified that he and Appellant were allegedly together at the time of the shooting. Accordingly, Appellant's claim warrants no relief. *Schuck, supra.*

At the PCRA hearing, Appellant also presented the testimony of Sharon Smith whom he alleged was a newly discovered witness. Smith testified that on December 9, 1981, she, together with her husband and two eldest children, were staying in what was then called the Midstown Hotel. She claimed that early in the morning on that date, she heard loud arguing and then two, or perhaps three, gunshots. When she then looked out her window, she saw several police officers beating a black man with their sticks and kicking him. She claimed to hear the officers shouting: "kill the black m....f...er" and "beat the shit out of the black m...f...er." (N.T. 8/9/95 pp. 112–115). She testified that the man she saw was being beaten so bad that she thought he might die. (N.T. 8/9/95 p. 125). On cross-examination, Smith explained that she never came forward with this information despite her

knowledge of the trial of Appellant, because she feared the police and because her husband advised her not to get involved. (N.T. 8/9/95 pp. 121, 133). She claims that she only now came forward with this information because she did not believe Appellant should be executed. (N.T. 8/10/95 p. 121).

The PCRA court found Smith's testimony regarding this alleged beating to be incredible. In support thereof, the court cited to the testimony of Appellant's treating physician at Jefferson Hospital who, as noted above, testified that Appellant's injuries were not consistent with having been beaten as described by Smith (N.T. 6/28/82 pp. 28.58; 28.100); the fact that Appellant had not complained to the treating physician that he had been beaten (N.T. 6/28/82 pp. 28.92–101); and the fact that Appellant never offered evidence substantiating any claimed beating. (N.T. 6/28/82 pp. 28.92–103). Since there is support in the record for the court's finding respecting the testimony of Smith, this court is bound by that finding. *Beasley, supra.* The PCRA court also found her testimony that she was unavailable at trial to be not credible. Essentially, the PCRA court found significant the fact that Smith never explained why her alleged reasons for not coming forward with this information sooner ceased to have an affect on her willingness to testify in 1995. As noted previously, in reviewing credibility determinations we, as an appellate court, give deference to the trier of fact's assessment of a witness' trustworthiness since it is the trier of fact who had the opportunity to personally observe the demeanor of the witness. *Farquharson, supra.* After giving such deference to the PCRA court's findings regarding Smith, and having found sufficient support in the record for those findings, we conclude that Appellant's claim that Smith's testimony constitutes newly discovered favorable evidence is without merit.

 Appellant next asserts that the PCRA court improperly precluded the proffered testimony of his brother, William Cook, who would allegedly testify that a passenger in the Volkswagen shot Officer Faulkner. This claim is entirely devoid of merit.

William Cook was present during Appellant's trial, but was not called to testify. It is Appellant's contention that he offered to prove at the PCRA hearing that his brother was "unavailable" at trial because of a concern that criminal charges might be filed against him. Following closing arguments at the PCRA hearing, counsel for Appellant indicated that he wished to call William Cook, but that Cook's counsel, Daniel–Paul Alva, wished to first make certain representations to the court respecting his client. Following some further discussion, it was determined that Mr. Alva would have Cook in the courtroom the following day. However, when the court reconvened the following day for that express purpose, Appellant's counsel represented that he was not successful in securing William Cook's presence, and, instead offered Cook's attorney, Mr. Alva, to explain Cook's absence. Respecting whether or not William Cook was "unavailable" at the time of trial due to an assertion of the Fifth Amendment, Mr. Alva commented only that he was informed that "it had been decided that he [William Cook] would not testify." (N.T. 9/12/95 p.8). As such, Appellant has failed to establish that William Cook was unavailable at the time of trial. Further, contrary to Appellant's assertions, the court did not refuse to continue the matter until Cook could be located. Rather, the court commented that, given the representations of Appellant's PCRA counsel that they had tried repeatedly to subpoena him but were unsuccessful, the court would, at that point, conclude the proceedings, but that in the event the defense was able to produce William Cook, the proceedings would be reopened.

Thus, contrary to Appellant's contentions, he was not denied the opportunity to either establish the unavailability of William Cook or to secure his presence at the PCRA proceedings. The record clearly demonstrates that Appellant's claim lacks even arguable merit.

■ Appellant offered yet another claim of alleged previously undisclosed evidence of police coercion in connection with the second remand; this one respecting one Pamela

Jenkins, a prostitute in the Philadelphia area. In the application, Appellant states:

> Specifically, if given the opportunity, Jenkins will testify that, in late 1981, police pressured her to falsely identify Jamal as the shooter in this case. Jenkins would further testify that she knew prostitute and prosecution witness Cynthia White, also know as "Lucky," and that White also was subjected to threats by police, which produced her false identification of Jamal as the shooter. None of this has ever been disclosed to the defense before.

Application pp. 1–2.

Our review of the record respecting this second remand hearing reveals no evidence which would support the granting of PCRA relief. First, contrary to Appellant's contentions, the evidence presented was not exculpatory. Although Pamela Jenkins testified that Cynthia White told her that she was afraid of the police; that the police were attempting to get her to say something about the murder of Officer Faulkner; and that she had been threatened with her life by the police, at no time did Pamela Jenkins testify that Cynthia White's testimony at trial was perjured or that Cynthia White even alleged that her testimony was false. Also, a significant portion of Jenkins' testimony involved alleged communications with Cynthia White occurring at a time after White had been confirmed dead.[32] Furthermore, while Jenkins testified that she was badgered and coerced by police to implicate Appellant in the shooting, she, in fact, never offered any testimony implicating Appellant and, thus, we find it unlikely that her testimony, if it had been available at trial, would have altered the verdict.[33]

32. While the defense claimed at the hearing that the death certificate for Cynthia White was not authentic, the defense acknowledged that it was unable to disprove the fact of her death.

33. At this second remand hearing, it was Appellant's contention that the inducements and/or coercion of Jenkins was at the behest of one, Officer Thomas Ryan. Jenkins testified that she met Officer Ryan approximately one year prior to the shooting when he stopped her for truancy while she was attending Simon Gratz High School. (N.T. 6/26/97 p. 82). Respecting the shooting, it was Jenkins' testimony that Officer Ryan escorted her to police headquarters the Saturday following the shooting where she was then placed in an interrogation room where Officer

As such, Appellant's claim that Jenkins' testimony constitutes "after-discovered evidence" is meritless. *Schuck, supra.* Most significantly, the trial court explicitly found Pamela Jenkins to be incredible. Our review of the record reveals support for the court's conclusion; accordingly that ruling remains inviolate. *Beasley, supra.* This second remand hearing, therefore, produced no additional evidence which would support the granting of post-conviction relief.[34]

Ryan and another officer attempted to pressure her into incriminating Appellant. (N.T. 6/26/97 pp. 40–43). She also testified that Officer Ryan later paid her money to locate Cynthia White. (N.T. 6/26/97 p. 49). However, in rebuttal, the Commonwealth offered evidence that Jenkins could not have had these alleged contacts with Officer Ryan at the time's she testified they occurred. First, the Commonwealth offered evidence that Officer Ryan did not become a police officer until December 21, 1981. That date post-dates both the date of the alleged truancy stop and the date of the alleged interrogation. Also, the custodian of records for the Philadelphia School District, confirmed that Jenkins was enrolled at Simon Gratz between January 19, 1982 and December 6, 1982.

**34.** Respecting Appellant's claim that all of these witnesses and/or their PCRA proffered testimony constituted "after-discovered evidence," we note that notwithstanding the above conclusions, there remains the following unequivocal testimony of Michael Scanlon and Albert Magilton, both of whom presented damaging testimony at trial, which testimony renders it unlikely that any of the above claims, either singularly or cumulatively, could compel a different verdict.

Scanlon testified that he was stopped at a red light on Locust Street approaching 13th Street, when he observed an African American male engaged in a verbal altercation with a police officer. He then saw the male turn around and assume a "spread-eagle" stance. The male then swung back around, striking the officer in the face with his fist. He explained that as the officer was then trying to subdue the male, another African American man ran across the street from the parking lot and pointed his hands at Faulkner. Scanlon saw this second man raise his hand and he heard a gunshot. He heard another shot as the man was near the officer; he saw the officer fall; and then observed the man stand over the officer and shoot two more times. After witnessing this, Scanlon turned left onto 13th Street in pursuit of an officer to assist. (N.T. 6/25/82 pp. 8.5–8.12). Scanlon testified that he could not identify either the first or second man, but when presented with a jacket previously entered into evidence, he positively identified it as the one worn by the man who ran from the parking lot. (N.T. 6/25/82 pp. 8.12, 8.62–8.63).

Magilton was walking east on Locust Street and, at the corner of 13th, stopped to watch because an officer pulled over a Volkswagen. As he proceeded to cross Locust Street, Magilton saw a man coming out of the parking lot with his hands behind his back, moving fast

 Appellant next contends that he was unable to present an adequate defense due to the court's denial of adequate funds; the Commonwealth's suppression of key evidence; and the ineffective assistance of trial counsel. While Appellant presents somewhat distinct theories of relief in his current appeal, in essence, he is arguing the precise issue addressed by this court on his direct appeal: whether the trial court failed to afford adequate investigative resources thereby depriving Appellant of a meaningful ability to present a defense in violation of his due process rights. *Abu–Jamal,* 521 Pa. at 200–202, 555 A.2d at 852. Accordingly, Appellant is not entitled to PCRA relief on this claim. *See, Beasley, supra.; Commonwealth v. Christy,* 540 Pa. 192, 201–203, 656 A.2d 877, 881 (1995)(a petitioner cannot obtain PCRA review of previously litigated claims by alleging ineffectiveness and presenting new theories of relief to support that previously litigated claim.).

Appellant next complains that the prosecution withheld Federal Bureau of Investigation (F.B.I.) files evidencing that Appellant had been under constant surveillance for years because of his political affiliations and had committed no criminal conduct. Appellant complains that the court improperly denied his proffer of over 600 pages of alleged FBI files which he claims would have supported his contention. The court denied the admission of these documents on the basis that the defense had failed to lay a proper foundation for their admission.

 The admission of evidence is a matter vested in the sound discretion of the trial court, whose decision thereon

across the street toward the spot where the officer had stoped the Volkswagen. Magilton then turned and lost sight of the man. Magilton heard some shots, looked over, did not see the officer, went back across the street, looked down and saw the officer laying on the sidewalk and the other man sitting on the curb. The police then arrived, handcuffed the man and put him in the wagon. When taken to the wagon, he identified Appellant as the man he had seen crossing the street. (N.T. 6/25/82 pp. 2.76–2.80). At trial Magilton, via a stipulation necessitated by Appellant's absence from the courtroom, also identified Appellant as the man he saw running across the street. (N.T. 6/25/82 p. 8.79.).

can only be reversed by this court upon a showing of an abuse of discretion. *Commonwealth v. Williams,* 541 Pa. 85, 94–95, 660 A.2d 1316, 1321 (1995). The court's ruling on this issue did not constitute an abuse of discretion, but rather constituted a proper evidentiary ruling. Absent any authentication that these files were, indeed, FBI files, there is simply no basis for their admission.

Appellant claims, as well, that he sought to subpoena one Inspector Alphonse Giordano to establish that he knew Appellant through police surveillance. While a subpoena for Giordano was, indeed, quashed at the PCRA hearing, there was no offer of proof made at the hearing to support Appellant's current claim.

In short, Appellant's contention that this evidence would have established police bias against him as well as the fact that he had no prior criminal history, is of no moment. First, we note that the fact of his lack of a prior criminal history was known to the jury given its finding of this precise mitigating circumstance. Moreover, even assuming that such files did exist, Appellant fails to explain how such files could be exculpatory. Appellant's claim is, thus, without merit.

■ Appellant next asserts trial counsel's ineffectiveness as a basis for obtaining collateral relief. He argues generally that trial counsel failed to adequately prepare his defense and that the animosity which developed between counsel and Appellant necessarily rendered counsel ineffective. The PCRA court, however, found that the animosity that existed between counsel and Appellant resulted solely from Appellant's persistent refusal to cooperate with his counsel and his personal decision to direct the trial strategy. As noted *infra,* that finding is supported in the record and we are, thus, bound by that finding. *See, Beasley, supra.* Given that finding, Appellant's current claim lacks merit since his decision to pursue his own trial strategy renders any claim of ineffective assistance of counsel a nullity. *Commonwealth v. Szuchon,* 506 Pa. 228, 250–252, 484 A.2d 1365, 1377 (1984).

Appellant goes on to recite specific instances of trial counsel's alleged ineffectiveness. However, Appellant's argument as to the specific instances is largely redundant as he has elsewhere in this appeal raised the underlying merits respecting each of those instances and therein also included a claim of counsel's ineffectiveness. Accordingly, as this court has found no merit to any of those underlying claims, we need not, at this point, again individually analyze the claims since there can be no finding of ineffectiveness where the underlying claim lacks merit. *Commonwealth v. Tilley*, 528 Pa. 125, 149–151, 595 A.2d 575, 587 (1991).

Appellant submits next that the trial court prematurely and unjustifiably stripped him of his right to self-representation when back-up counsel was ordered to take control of the voir dire and the subsequent trial. Appellant's claim is devoid of merit.

Appellant, who had been granted indigent status, steadfastly insisted from the initiation of this matter that he be permitted to proceed with "counsel" of his choice. However, he insisted on proceeding with an individual known as John Africa who was not a licensed attorney and had apparently never received any formal legal schooling. The court properly refused this request and, when Appellant requested to then proceed *pro se,* the court initially permitted such status and as a precaution appointed back-up counsel to assist Appellant. When it became apparent that Appellant was unable to properly conduct *voir dire,* the court first asked Appellant whether his back-up counsel could take over the questioning or whether he preferred the court to conduct *voir dire.*[35] Appellant steadfastly refused to permit his back-up counsel to take part in any of the proceedings and argued vehemently that the court should not perform the *voir dire* questioning. We find that the court properly took over the questioning and then properly ordered that back-up counsel take control.

**35.** The trial court noted at the time of voir dire that several of the potential jurors were obviously shaken by Appellant's questioning. Appellant also refused to adhere to proper procedure during this voir dire.

■ All defendants, even those who may display the potential to be disruptive, have the right to self-representation. *Commonwealth v. Africa,* 466 Pa. 603, 620–622, 353 A.2d 855, 864 (1976). In such instances, however, it is advisable that stand-by counsel be appointed. *Id.* at 620–622, 353 A.2d at 864. As explained in *Africa,* in such circumstances:

> The court should explain to the defendant the standards of conduct he will be expected to observe. If the defendant misbehaves, he should be warned that he will be removed from the court, his right to represent himself will be considered waived, and the trial will continue in his absence with standby counsel conducting the defense. If the defendant again misbehaves, these measures should be taken. The defendant must be made to realize that his disruptive tactics will result only in his exclusion from the courtroom. His case will be tried according to law, in an attempt to do justice, whether he cooperates or not.

*Id.* at 621, 353 A.2d at 864. The record evidences that the trial court fully complied with the dictates of *Africa.*

■ Appellant also asserts that the court's decision to take away his *pro se* status and to direct back-up counsel to proceed, denied him his right to counsel of his choice. While an accused is constitutionally guaranteed the right to the assistance of counsel that right gives to a defendant only the right to choose, *at his or her own cost,* any attorney desired. Where, as here, an accused is indigent, the right involves counsel, but not free counsel of choice. *Commonwealth v. Segers,* 460 Pa. 149, 153–155, 331 A.2d 462, 465 (1975). Accordingly, Appellant was not denied his right to the assistance of counsel, and, therefore, this claim warrants no relief.

■ Appellant next argues that he was improperly removed from the courtroom for significant portions of his trial. He claims that such removal violated his right to self-representation and was not properly tailored to assure continued communication with his counsel and assistance with his defense. Appellant claims he was not disruptive and asserts that it was error to remove him from the courtroom and

thereby deny him of his right to represent himself. Disruptions, particularly those that are purposeful and persistent, are not to be tolerated as they threaten the court's ability to conduct a trial properly. *Africa*, at 619–620, 353 A.2d at 863. Removing a disruptive defendant from the proceedings is a permissible means for a court to discharge its duty to defend the judicial process. *Id.* at 620 n. 12, 353 A.2d at 863 n. 12, citing *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). The record is replete with instances of Appellant's unwillingness to cooperate with the court and/or his counsel. He was oftentimes argumentative with the court, even after repeatedly being warned that if this disruptive behavior did not cease, he would be removed from the courtroom. Under these circumstances the removal of Appellant from the proceedings was proper. *See, Africa, supra.*

■ Appellant further contends that upon his removal the court failed to employ available technology to ensure that Appellant could monitor the proceedings and promptly communicate with his attorney. Conspicuously absent from Appellant's argument is any assertion that his attorney, indeed, failed to keep him properly informed. There is at least some indication to the contrary in the record that during such absences, trial counsel told Appellant what had transpired and/or what the intended course of action was. (See, N.T. 6/28/82 p. 6).

■ Appellant next argues that his absence from two specific *in camera* conferences violated his due process rights. Both of these conferences occurred during a time in which Appellant had been removed from the courtroom due to his persistent disruptive behavior. The first conference involved the violation by a juror of the court's sequestration order. The issue of whether this juror was properly removed is discussed *infra*. Appellant's attorney was present at this conference and acquiesced in the court's determination that the juror should be removed, especially due to the fear that during her absence, she may have been privy to information regarding the trial. Appellant does not submit that he disa-

greed with the removal of this juror and, indeed, the record evidences that this particular juror appeared hostile toward Appellant during the *voir dire* proceedings.

The second conference involved a discussion regarding evidence the court had ruled inadmissible on hearsay grounds. Specifically, the defense was requesting an opportunity to question two police officers respecting whether they had information which would reveal that an officer other than Officer Faulkner shot Appellant. As the purpose of this inquiry was to determine if, indeed, there was evidence that another officer may have shot Appellant, the court, upon agreeing to conduct the inquiry, properly dictated that the inquiry be held *in camera.* While Appellant was absent from this conference due to his own obstreperous behavior, at defense counsel's insistence, Appellant was given the choice of attending this inquiry. Appellant refused to attend unless the court agreed to hold the inquiry in open court. This request the court correctly refused. It is important to note at this juncture that this inquiry ultimately revealed that no such evidence existed and these two officers were never called to testify. Contrary to Appellant's assertions, this conference was not a "critical" stage of the proceedings and he was not denied his right to a public trial since the inquiry revealed no admissible or relevant trial evidence.

In sum, Appellant's absence from these conferences was due to his own making and, in any event, no resulting prejudice can be shown from his absence at either of these times. Thus, this claim warrants no relief.

 Appellant argues next that the prosecution's summation at guilt phase exceeded the permissible bounds of advocacy. Appellant challenges, specifically, four comments advanced by the prosecution during this summation. Generally, a prosecutor's arguments to the jury are not a basis for the granting of a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility towards the accused which would prevent them from properly weighing the evidence and

rendering a true verdict. *Commonwealth v. Gorby*, 527 Pa. 98, 112–114, 588 A.2d 902, 909 (1991). Moreover, the prosecution and the defense alike are afforded wide latitude and may employ oratorical flair in arguing to the jury. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 52–55, 454 A.2d 937, 956–957 (1982). The arguments advanced must, however, be based upon matters in evidence and/or upon any legitimate inferences that may be drawn from the evidence. *Commonwealth v. Chester*, 526 Pa. 578, 597–599, 587 A.2d 1367, 1377 (1991). Finally, any allegedly improper prosecutorial comments must also be examined within the context of the conduct of defense counsel. *Commonwealth v. Morales*, 549 Pa. 400, 423–425, 701 A.2d 516, 528 (1997). If a challenged remark is made in response to the defense's closing argument, it will generally be deemed fair response and hence permissible comment. *See e.g. Commonwealth v. Williams*, 539 Pa. 61, 76 n. 13, 650 A.2d 420, 428 n. 13 (1994), citing *Commonwealth v. Floyd*, 506 Pa. 85, 484 A.2d 365 (1984).

 Appellant first complains that the prosecution's closing impermissibly "ridiculed" Appellant's assertion of his Sixth Amendment right to counsel. Appellant recites the following comment in support of this claim.

Will you understand that the Defendant is on trial for taking somebody's life, too. That is one thing we hadn't heard too much about. It maybe true and indeed it is true that Daniel Faulkner on December 9th, at 3:51 as he looked up at the barrel of this gun did not have an opportunity to ask for any type of abusive remarks in relation to anybody, the system, the laws or anything. No one quickly ran down and said, "Do you want an attorney?"

(N.T. 7/1/82 pp. 147–48). For several reasons, we cannot conclude that these comments were impermissible.[36] Initially,

36. We note that while Appellant raised this theory in his amended PCRA petition, in support thereof he cited to a distinct section of the closing. Accordingly, the PCRA court addressed the theory on the basis of that distinct comment and did not touch on the comment recited above. Our review of Appellant's brief, together with his original PCRA petition, as well as the amended petition, reveals other instances of this

we note that Appellant has taken these comments out of context. Viewing these comments in the proper context, it is clear that the point being expressed by the prosecution was simply that the jury should consider not only the fact that the defendant's life was at stake in this trial, but also that a life, that of Officer Faulkner, was unjustly taken and that the jury should consider that loss in rendering its verdict.[37] While a portion of this comment did, indeed, reference Appellant's behavior, that portion was rather innocuous, and, in any event, when read in context, was not outside the bounds of permissible oratorical flair.[38]

 Next, Appellant contends that the prosecution improperly commented on his right not to testify. In so arguing, Appellant points to the following comment:

... although they have no burden to do anything, of all that they had, all that was presented to them over that period of time you saw what the defense put on, and they don't have any burden that is true, but.... Are they suggesting that there was a third man, a fourth man, or is he doing this all for his brother? I ask you to look through all of this, as well as any other strategy or tactics you have seen during

type of misguidance. We do not countenance such tactics. However, for the sake of completeness, we shall nevertheless address his claims.

37. Immediately preceding the challenged remarks, the prosecution stated:

Let me tell you this, let me make this clear, you have heard constantly, constantly you have heard about the facts that this Defendant is on trial for his life. You have heard this all the time. Let me also add this ...

(N.T. 7/1/82 p. 147).

38. In a footnote, Appellant points to yet two more references wherein the prosecution commented specifically on the "arrogance" of the defendant, arguing that these comments as well were impermissible. After having the read the entire closing argument and, more particularly, in having read these challenged comments in the context in which they were made, we find them to be within the bounds of permissible comment and, in any event, not prejudicial to Appellant. Both comments were made as part of the prosecution's argument that the intent to kill was established. Such argument is permissible. *Commonwealth v. D'Amato*, 514 Pa. 471, 489–491, 526 A.2d 300, 309 (1987)(a prosecutor may always argue to the jury that the evidence establishes the defendant's guilt).

the course of this whole particular trial and recognize it for what it is.

(N.T. 7/1/82 pp. 171–72). We do not agree with Appellant's claim that this comment included impermissible references to Appellant's right not to testify. The prosecution here simply commented on the defense evidence, arguing that it was not sufficient to overcome the prosecution's evidence of guilt.

■ Appellant argues further that the prosecution improperly appealed to community sentiment in order to inflame the jury by commenting as follows:

> This is one vicious act. This is one uncompromising vicious act. This is one act that the people of Philadelphia, all of them, all of you everywhere is [sic] outraged over. This act demands action. This act demands a reasonable view and the result of responsibility and courage.... An officer of the law who serves two years in service and assists individuals throughout that time, some of whom have testified here. He helped a rape victim and mother of the victim and [sic] the last arrest he ever made. That man as a member of the Police Force comes back from war and is faced with a war on the street right at 13th and Locust. Ladies and gentlemen, I ask you, all of us, the Commonwealth, the people of this city, reach out to you and demand justice. Look right at that intent to kill and that man who did it with that weapon and say, "The evidence is clear to all of us. You are guilty of first degree murder."

(N.T. 7/1/82 pp. 172; 187). Contrary to Appellant's portrayal, the challenged comments do not impermissibly urge the jury to convict on some generalized grounds, such as to protect society or preserve civil order. Rather, the comments were limited to a plea to convict Appellant based solely on the actions committed in the instant matter, and, thus, were within the bounds of proper oratorical flare. *Cf. Commonwealth v. LaCava*, 542 Pa. 160, 666 A.2d 221 (1995)(it is improper for the prosecutor to urge the jury to sentence a defendant to death as a means of retribution for the ills inflicted on society by drug dealers rather than based on statutorily enumerated aggravating circumstances).

■ Appellant also submits that the prosecution, in its summation, improperly vouched for the credibility of two witnesses. First, he submits that in commenting on the testimony of Robert Chobert, the prosecutor supplied his personal assurance that Chobert was credible, knowing that evidence of his bias and motive for testifying had been withheld. However, as discussed previously, the alleged promise of penal benefits in connection with Chobert's suspended license was not proven by Appellant to actually exist. Moreover, the prosecutor did not personally vouch for the credibility of Chobert, but merely argued from the evidence that his testimony supported a guilty verdict. Such argument is permissible. *Chester, supra.*

■ Appellant next claims that the prosecution improperly vouched for the credibility of Priscilla Durham by referring to purported testimony of James LaGrand, a fellow security officer of Durham's, who never testified. In so arguing, Appellant cites to N.T. 7/1/82 p. 173, wherein the prosecution, in arguing that the evidence was sufficient to convict, noted, *inter alia:* "Priscilla Durham. Present was also LaGrand as he comes in and makes that statement." The Commonwealth responds that this comment was a fair representation of the evidence presented at trial. Specifically, the Commonwealth submits that the fact of LaGrand's presence during the statement Durham gave to police in February 1982 was in evidence. Our review of the record reveals, however, that at trial, on re-direct examination of Durham, the following exchange occurred:

BY MR. McGill: (for the prosecution)

Q. Now also normally in reference to giving the statements to the police when would it be that that you would give a statement to the Philadelphia police, in what kind of a situation?

A. In an official capacity, if I myself called them. As far police business, I have no interference. I don't have to make statements to the police ...

Q. Okay.

A. ....when they bring in prisoner, that's their prisoners and we don't have anything to do with it.

Q. Would you, for example, if it was a crime that occurred in the hospital then would you become actively involved and give statements if you were a witness or in any way connected with it?

A. Yes. It would have to be within the hospital.

Q. So your duties, then, really were limited in terms of responded [sic] to interviews in the normal course of events to your supervisor in the hospital, which you did.

A. Right.

Q. And the next time that you had an opportunity, I believe..well, the next time that you told anything to the police was when they came to you on February the 9th?

A. Yes.

Q. Was there any other security officer in that general area there?

A. Yes.

Q. There? Who?

A. Officer James Legrand [sic].

Q. He is also a security officer?

A. Yes, he is.

(N.T. 6/24/82 pp. 123–24). It is not entirely clear from this trial testimony at what point Durham is claiming that La-Grand was present. Arguably, the challenged comment of the prosecution implies that this testimony established that La-Grand was present when Appellant allegedly made the confession that he had killed Officer Faulkner and, thus, may not be fair representation of the original testimony. On review, we cannot conclude that this representation had the unavoidable effect of prejudicing the jury to the point that it could not render a true verdict. First, the comment was an isolated occurrence. Moreover, the statement itself, when viewed against the evidence the jury heard during trial on this issue, was ambiguous enough so as not likely to have led the jury to believe, as Appellant suggests, that LaGrand, too, heard Ap-

pellant's confession. Accordingly, we cannot conclude that Appellant's claim here warrants relief.

■ Appellant next asserts that the prosecution, in arguing to the jury that there were numerous statements, expert reports and physical evidence made available to the defense, somehow conveyed to the jury that Appellant's failure to present such evidence was indicative of the fact that no such evidence existed. In support, Appellant recites the following comments:

> ... fifty-seven statements all given to the defense, with one hundred and twenty-five other statements all given to the defense, with all sorts of medical reports and ballistic reports and chemical reports and property receipts and all physical evidence ... all that was presented to them over that period of time you saw what they put on.

(N.T. 7/1/82 p. 171). Appellant's argument here is preposterous. When the above statements are read in the context in which they were actually uttered, it becomes clear that the argument being advanced was in response to the defense's closing argument that the trial resulted from a conspiracy to frame Appellant. (N.T. 7/1/82 pp. 170–172). As such, it is fair comment. *Commonwealth v. Williams,* 539 Pa. 61, 76 n. 13, 650 A.2d 420, 428 n. 13 (1994).[39]

Appellant next raises several issues regarding the jury *voir dire.* Initially, he argues that he has established a *prima facie* case of the prosecution's pattern of using peremptory strikes to exclude African–Americans from the jury panel. While Appellant admits to having raised this issue on direct appeal, he nevertheless contends that evidence presented at the PCRA hearings demonstrates that, contrary to this court's assessment of this issue on direct appeal that "[t]he record reflects that eight of [the stricken] venirepersons were black," there were, in actuality, at least ten, and possibly eleven

---

**39.** Appellant submits as well that the cumulative effect of all the allegedly improper comments of the prosecution requires that he be granted a new trial. Having determined that none of his individual claims have merit, we must also determine that this current claim is unavailing. *See Commonwealth v. Williams,* 532 Pa. 265, 276–280, 615 A.2d 716, 722–723 (1992).

African–Americans peremptorily stricken by the Commonwealth. In support thereof, Appellant relies on a stipulation entered into during the collateral proceedings regarding the fact that two venirepersons, whose races were not recorded at trial, would now testify that they are African Americans and that they were peremptorily challenged by the Commonwealth.[40]

In order to establish a *Batson* claim, a defendant must establish a *prima facie* case of purposeful discrimination. To do so, a defendant must demonstrate that he/she is of a cognizable racial group; that the prosecution has exercised peremptory challenges to exclude members of that racial group from the panel of venirepersons; and finally, that these facts and any other relevant circumstances raise an inference that the prosecutor used peremptory challenges to exclude venirepersons on the basis of race. Implicit in this scheme is the notion that peremptory challenges constitute a jury selection practice that allows for such discrimination by those who have a design to discriminate. *Commonwealth v. Dinwiddie,* 529 Pa. 66, 69–71, 601 A.2d 1216, 1218 (1992). If a defendant succeeds in establishing a *prima facie* case of purposeful discrimination, the prosecution is then required to provide non-discriminatory reasons for striking the potential jurors.

This court's analysis of this issue on direct appeal indicated that the record reflected that the prosecution employed peremptory challenges to strike eight African–American venirepersons. It now appears, via a stipulation, that there may have been two more African–American venirepersons stricken by the prosecution. That evidence does not alter our original conclusion. Significantly, in concluding on direct appeal that Appellant failed to establish a *prima facie* case of discrimination, we stated: "... we have examined the prosecutor's questions and comments during *voir dire,* along

**40.** The stipulation originally included reference to three individuals, not originally noted on the record as being African American, who would testify that they were, indeed, African Americans and were peremptorily challenged by the prosecution. Appellant later withdrew the name of one of those individuals from the stipulation.

with those of the appellant and his counsel, and find not a trace of support for an inference that the use of peremptories was racially motivated." 521 Pa. at 198, 555 A.2d at 850. Even assuming that ten, rather than eight, stricken venirepersons were African–American, we would still arrive at the same resolution of this issue that we did on direct appeal. Appellant's current claim, thus, warrants no relief.

■ Appellant next contends that the jury pool did not reflect a fair cross-section of the community. In his PCRA petition, Appellant contends specifically that the manner of polling juries in effect at the time of his trial, which was by voter registration list, was not a random selection process, and therefore did not satisfy the Federal and State constitutional standard that juries be selected from a fair cross-section of the community. The PCRA court correctly ruled that this precise claim has been repeatedly rejected by this court. *See, e.g. Commonwealth v. Jones,* 465 Pa. 473, 479–481, 350 A.2d 862, 866 (1976); *Commonwealth v. Henry,* 524 Pa. 135, 569 A.2d 929 (1990). In his brief to this court, Appellant asserts that the PCRA court misconstrued his argument on this issue. He contends that his claim is that "the jury system *rotated* voter lists in a way that denied a fair cross-section of the community at any given time." (Brief for Appellant, p. 98; emphasis in the original). Contrary to Appellant's intimations, our review of the record reveals that Appellant did not raise this precise argument, but rather raised the issue addressed by the PCRA court. Accordingly, we will not entertain his assertion that the court misconstrued his claim.

Appellant's next assertion, that he is entitled to discovery and a hearing on this claim, borders on the preposterous. Assuming Appellant had raised this claim to the PCRA court as he now asserts, it was his burden to present evidence at the PCRA hearing in support of that claim. This he did not do. Accordingly, even if we would find this issue to have been properly preserved, Appellant has utterly failed to carry his burden.

██ Appellant next claims that the court improperly denied a juror's request to leave to attend to personal business, despite sequestration, without notifying the defense, and then used this incident to later remove that same juror from the panel. It appears that during the course of the trial, an African–American woman juror had asked the court crier if she could go home to tend to her sick cat and was told, after the crier had consulted with Judge Sabo, that she was not permitted to leave. This juror nevertheless left that same evening without notifying anyone, returning to the hotel several hours later. When confronted upon her return, she commented: "I don't care what Judge Sabo or anybody says, I do what I have to do. Nobody is going to stop me." Prior to the beginning of testimony the following day, a conference was held in the judge's chambers respecting numerous issues, one of which involved Ms. Dawley's violation of sequestration. Present during the relevant discussion was the judge, the court crier, the prosecutor and Appellant's counsel, Anthony Jackson. It appears that Appellant was not present due to the court's prior ruling barring him from the proceedings due to his misbehavior. Given this juror's open defiance of the court's sequestration order, the judge, with the concurrence of both counsel, determined that the juror should be removed. (*See* N.T. 6/18/82 pp. 2.35–2.47). It was discussed at this hearing that during *voir dire* this particular juror had openly expressed a dislike for Appellant. Appellant now relies on that discussion to argue that the court actually "engineered" the removal of this juror. His claim is devoid of merit.

██ During the in-chambers discussion, Judge Sabo expressed his concern that this juror exhibited such defiant misbehavior that, if she remained on the panel, she may display this type of behavior again and/or that her unauthorized disappearance may be seen by other jurors as permissible behavior. Contrary to Appellant's assertions, it does not appear that Judge Sabo in any manner orchestrated her removal. Rather, Judge Sabo was justifiably concerned that the jury remain free from external influence. The court evidenced a legitimate concern for the integrity of the jury.

Rule 1108(a) of the Pennsylvania Rules of Criminal Procedure provides that a trial court may seat an alternate juror whenever a principal juror becomes unable or disqualified to perform his or her duties. Such a decision will be reversed on appeal only upon a finding of an abuse of discretion. *Commonwealth v. Jacobs*, 536 Pa. 402, 639 A.2d 786 (1994). We find no such abuse of discretion. Moreover, Appellant has failed to demonstrate how he was prejudiced here. Indeed, given this juror's open hostility towards Appellant, a finding of prejudice from her removal would be unlikely.

Appellant next asserts that three white jurors improperly deliberated outside the presence of other jurors during the midst of the trial. Appellant complains that the trial court improperly precluded his proffer to call some of the jurors to testify to these alleged deliberations. However, as the PCRA court noted, this ruling is consonant with the law of this Commonwealth which forbids the post-verdict testimony of jurors which would tend to impeach the verdict. *Commonwealth v. Patrick*, 416 Pa. 437, 206 A.2d 295 (1965).

Appellant next asserts that the method of assigning homicide cases in Philadelphia County in 1982 violated the Pennsylvania Constitution. Specifically, Appellant takes issue with the existence of a "Homicide Unit" division of the Court of Common Pleas of Philadelphia County, arguing that such constitutes a "special tribunal" in violation of Article I, Section 15 of the Pennsylvania Constitution. This argument is clearly devoid of merit.

Article I, Section 15 of the Pennsylvania Constitution provides "No commission shall issue creating special temporary criminal tribunals to try particular individuals or particular classes of cases." In *Commonwealth v. Moore*, 534 Pa. 527, 633 A.2d 1119 (1993), we discussed the scope of Article I, Section 15's prohibition, noting that this provision was intended to secure to the Commonwealth, as well as to the accused, a trial by ordinary tribunals and not special tribunals created for the trial of a particular case with a view to producing a particular result. However, we specifically found that Article

I, Section 15 has no applicability to the ordinary general criminal jurisdiction of the courts of common pleas of this Commonwealth. Accordingly, Appellant's assertion here that the administrative assignment of certain judges of the Court of Common Pleas of Philadelphia County to hear only homicide cases is not a violation of Article I, Section 15.[41]

Appellant next challenges trial counsel's stewardship respecting his representation of Appellant at the penalty phase. He asserts counsel's ineffectiveness in failing to prepare for the penalty phase and most significantly for not presenting mitigating witnesses who would demonstrate that Appellant was an admired and award-winning journalist, that he was involved in community service and that he was a loving family man who abhorred violence.

 Counsel will not be deemed ineffective for following the penalty phase strategy designed and/or directed by the accused. *Beasley,* 678 A.2d at 778. Similarly, an accused cannot refuse to cooperate with counsel respecting a particular trial strategy and then later argue ineffectiveness on the part of counsel for failing to pursue a particular course of action. *Commonwealth v. Pierce,* 537 Pa. 514, 526–528, 645 A.2d 189, 196 (1994). Simply stated, the law is clear that an accused bears the burden of the consequences flowing from his own obstinance. *Commonwealth v. Szuchon,* 506 Pa. 228, 250–252, 484 A.2d 1365, 1377 (1984).

 Appellant presented several witnesses at the PCRA hearing who, in essence testified to Appellant's talents as a journalist, his dedication to community services and his devotion to his family and humanity generally. All of those witnesses testified that they were available and willing to so testify at this trial. Appellant's trial counsel, Anthony Jackson, testified at length during the PCRA proceedings. Signifi-

41. In conjunction with this argument, Appellant asserts that the existence of this "Homicide Unit" also violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution because it results in the arbitrary and unequal imposition of the death penalty. Appellant has failed, however, to offer even a scintilla of proof to support this claim.

cant to Appellant's current contention, Jackson testified that he, and not Appellant, dictated the penalty hearing strategy. However, the PCRA court made a credibility determination that Jackson was not credible when he testified to such. The court found as a fact, that Appellant chose to exercise personal control over his trial strategy, including, specifically, the selection of character witness during the guilt phase. Also, the court found that it was Appellant who chose to read a statement at the penalty hearing and that Appellant never consulted with counsel regarding this statement. In short, the court found that Appellant's steadfast refusal to cooperate with his counsel continued in the penalty phase. Our review of the record leads us to no different conclusion. As noted previously, where, as here, an accused makes his own strategic choices at trial, he has no recourse for those choices in the form of a claim of ineffective assistance of counsel. *Id.* Accordingly, since the record supports the PCRA court's conclusion that the failure to present mitigating witnesses was as a result of Appellant's own choosing, this court is bound thereby and Appellant's claim, thus, warrants no relief.

Appellant next challenges the prosecution's penalty phase closing argument. He makes three distinct arguments regarding this closing: (1) that the summation unfairly tarnished Appellant's character by exploiting his decision to exercise his Fifth and Sixth Amendment rights; (2) that the prosecutor improperly argued that the jury's decision at penalty phase involved only a mechanical process as opposed to any exercise of discretion; and (3) that the prosecutor improperly expressed his view that a sentence of death was warranted here.

 As noted previously, the statements of a prosecutor will not be grounds for relief unless the unavoidable effect thereof is to fix in the minds of the jury a settled bias and hostility towards the accused which would prevent them from properly weighing the evidence and rendering a true verdict. *Gorby, supra.* At the penalty hearing, where the presumption of innocence no longer has application, the prosecutor is granted greater latitude in presenting an impassioned plea for

a sentence of death. *Travaglia,* 541 Pa. at 134–135, 661 A.2d at 365.

■ Appellant argues first that the following comments by the prosecution during the penalty phase impermissibly commented on Appellant's right not to testify:

> You heard nothing at all, ladies and gentlemen, in reference to testimony as to any kind of emotional feelings on the defendant's part because he has, as his absolute right, he did not choose to take the stand and testify what the circumstances were.

(N.T. 7/3/82 pp. 59–60). We do not construe the above-quoted language as an attempt to have the jury draw an adverse inference from Appellant's failure to testify. Indeed, while responding to the argument raised by Appellant's counsel during closing, the prosecutor here explicitly told the jury that Appellant possessed the right not to testify. In any event, when viewed in context, it is clear that this statement was made in response to the comments made during the defense closing wherein the defense argued in mitigation that in shooting Officer Faulkner Appellant was acting under emotional disturbance. Based on the foregoing, we find that the prosecutor's comments were within the bounds of fair response and thus permissible. *Commonwealth v. Young,* 477 Pa. 212, 383 A.2d 899 (1978). Because the challenged remarks were permissible, counsel cannot be deemed ineffective for having failed to raise this issue. *Tilley, supra.*

■ Appellant next asserts that the prosecution improperly urged the jury to consider the difficulties Appellant had with trial counsel and/or the court. A persistent theme of the prosecution's closing was that Appellant believed himself to be above "law and order." This argument was made in response to the defense's closing argument which attempted to discredit the aggravating circumstance "killing of a police officer." In essence the defense argued that there should be no distinction between killing just anyone and killing a police officer. Pertinent to the instant claim of Appellant, the prosecution argued that Appellant's lack of concern and respect for the law and

society was demonstrated by his murder of this police officer. In further support of that same theme, the prosecution detailed the instances throughout the proceedings where defendant displayed utter disrespect for the justice system. These comments were fair response to the defense closing, and when read in the context in which they were made, were not likely to cause a fixed bias or hostility towards Appellant which would impede the jury's ability to objectively render a true verdict. Thus, they do not warrant relief. *Morales, supra.*

 Appellant next argues that the prosecution improperly argued that the jury's duty in sentencing was a mere mechanical process, thereby diluting the moral gravity of its decision. This claim is devoid of merit. First, Appellant recites only a portion of the actual comment made by the prosecution. The challenged remarks were uttered as part of the prosecution's discussion of the law regarding the jury's statutory duties upon the finding of aggravating and mitigating circumstances. The challenged comments correctly conveyed the law. The prosecution correctly stated that once the jury determines that one or more aggravating circumstance outweighs any mitigating circumstance, section 9711(c)(iv) mandates that the sentence be death. This mandatory sentencing scheme has since been found to be constitutional. *See Blystone v. Pennsylvania,* 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990); *Commonwealth v. Peterkin,* 511 Pa. 299, 326–329, 513 A.2d 373, 387–388 (1986). Since there is no merit to Appellant's claim, any claim of ineffective assistance of counsel fails. *Tilley, supra.*[42]

42. We are compelled, *albeit* reluctantly, to address another "subissue" presented by Appellant. Appellant submits that, although previously litigated on his direct appeal to this court, the issue of whether the prosecutor's improper comments to the effect that Appellant would have "appeal after appeal" should be considered in assessing the cumulative effect of the other improper arguments. (Brief of Appellant at p. 113, n. 140). Appellant explicitly states that such comment is violative of the holding in *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). Significantly, this court addressed this precise issue in great detail in our opinion on Appellant's direct appeal from his sentence of death and concluded that this comment was **not** violative of *Caldwell. Commonwealth v. Abu–Jamal,* 521 Pa. at 207–212, 555 A.2d at 855–857. In light of our prior ruling, we cannot

■ The final claim of Appellant respecting this penalty phase summation is that the prosecutor impermissibly interjected his "authoritative view" that a sentence of death was warranted based on his own experience. (Brief of Appellant at p. 113).[43] Appellant objects to the prosecution's statement that law and order "is what this trial is all about more than any other trial I have ever seen...." (N.T. 7/3/82 p. 62). This claim, too, is without merit. Appellant has taken this statement out of context. In ascertaining whether challenged comments are improper, it is fundamental that the comments be viewed in the context in which they were made. *Morales, supra.* The comments were made as part of the prosecution's response to the defense claim that killing a police officer, as opposed to any other individual, should not constitute an aggravating circumstance. Indeed, immediately preceding the challenged remark, the prosecutor stated that, in response to the defense contentions, he would attempt to explain why this particular aggravating circumstance is important and valid. On review, we find nothing prejudicial or improper about this comment; even viewed in isolation as Appellant has presented it.[44] Accordingly, this claim warrants no relief. *Tilley, supra.*

countenance Appellant's and/or his counsel's audaciousness in now submitting a contrary legal conclusion as if this court's prior holding on this issue deserves no respect.

**43.** Although not stated as such, Appellant raises an additional argument here. Specifically, he contends that the prosecutor also interjected improper comment on the need to stop police killings because there will then be no one to protect the citizens. When read in context, these statements, too, were nothing more than fair response to the defense argument that the murder of a police officer should not be an aggravating circumstance and, thus, permissible. *Commonwealth v. Williams,* 539 Pa. 61, 76 n. 13, 650 A.2d 420, 428 n. 13 (1994).

**44.** In connection with this argument, Appellant further submits: "[t]he prosecutor went on to tell the jury that his mother told him that very morning: 'Joe, if you can come up and kill a police officer, who is going to protect me?' and invoked the 'constant battleground that we have during the course of every day in this City,' remarking 'we are one step from the jungle without the opportunity of individuals to enforce the law.'" (See N.T. 7/3/82 pp. 65–66). These excerpts, obviously taken out of context, were made as part of the prosecution's response to the defense claim that the murder of a police officer should not be an aggravating circumstance. When read in context they are fair response. Contrary to Appellant's intimations, these remarks did not

■ Next, Appellant asks that we reconsider two issues addressed by this court in his direct appeal. First, Appellant asks that we reconsider our conclusion that the introduction of comments made by him in a 1972 newspaper article which, *inter alia*, referenced Appellant's association with the Black Panther Party and quoted him as having said "political power grows out of the barrel of a gun" was permissible. Appellant contends that the subsequent decision of the United States Supreme Court in *Dawson v. Delaware*, 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992), supports this previously litigated claim that his First Amendment rights were thereby violated. Our prior ruling, however, is in complete accord with the decision in *Dawson*.

In *Dawson*, the state, in order to rebut mitigating character evidence adduced by the defendant, introduced evidence that the defendant was a member of the Aryan Brotherhood prison gang. This evidence was introduced via stipulation which proved only that an Aryan Brotherhood prison gang which entertains white racists beliefs originated in California in the 1960's and that a separate gang in the Delaware prison system calls itself the Aryan Brotherhood. The Court noted that had the prosecution offered the evidence it initially claimed it had which would demonstrate that this is a white racist gang associated with drugs and violent escape attempts at prison and that this gang advocates the murder of fellow inmates, the Court would likely have found no error in admitting evidence of the defendant's membership in that gang since the violent nature of that gang would be relevant to rebut evidence of the defendant's good character. In other words, the Court made clear that the admission of such affiliations of a defendant is proper only where there is evidence demonstrating some connection between that affiliation and the character evidence sought to be rebutted. *Id.* at 168, 112 S.Ct. 1093. In the instant case, Appellant's own quotes in the newspaper article

improperly attempt to persuade the jurors to sentence Appellant to death on the basis of any fact other than that he killed an officer; a factor which has clearly been recognized as worthy of the imposition of the death penalty given its status as an aggravating circumstance. *LaCava*, 542 Pa. at 192–194, 666 A.2d at 237.

evidence that the Philadelphia chapter of the Black Panther Party, to which Appellant belonged, would use violence if necessary to quell, what the Party perceived to be, rampant police brutality against Party members. Accordingly, the nature of the Party was amply demonstrated and the requisite connection between membership in the Black Panther Party and the character evidence presented by Appellant, specifically, that he was a peaceful and genial man, was met. Thus, this issue has been finally litigated and warrants no further review, even in light of the subsequent decision in *Dawson.* *See,* 42 Pa.C.S. § 9544(2); *Commonwealth v. Szuchon,* 548 Pa. 37, 693 A.2d 959 (1997).

Appellant also argues that we should reconsider our holding on direct appeal wherein we concluded that it was proper to allow the prosecution to cross-examine Appellant following his plea of mitigation.[45] This issue warrants no further review as it, too, has been finally litigated. *See Abu–Jamal,* 521 Pa. at 210–214, 555 A.2d at 857–858.

 Appellant next submits that the penalty phase verdict slip was constitutionally defective pursuant to the dictates of *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). The crux of Appellant's argument on this point is that the structure of the form was such that the jury would be led to believe that unanimity was required in order to find, and thus consider, a mitigating circumstance. Appellant's argument regarding the structure is:

> The jury's completed verdict form showed one aggravating circumstance and one mitigating circumstance. On the first page of the form, the jury had to identify any mitigators it weighed by filling in a blank. Then, on the third page of the form, the jurors were required to identify mitigators by putting a check mark on the page. All twelve jurors had to sign that page.

(Brief of Appellant at p. 114). Initially, we note that Appellant offered absolutely no evidence in support of this claim at

**45.** At the penalty phase of Appellant's trial, Appellant himself presented a statement which has been referred to as a "plea in mitigation." The prosecution was then permitted to cross-examine him. Counsel for Appellant then proceeded to give the closing argument for the defense.

the PCRA hearing.[46] His sole support appears to be the verdict slip itself; a copy of which he appends to his PCRA petition. This argument is without merit. In *Mills*, the Supreme Court vacated a sentence of death on the basis that the judge's instructions, together with the verdict form, created a substantial probability that reasonable jurors may have believed that they were barred from considering mitigating evidence unless all twelve jurors agreed on the existence of any given circumstance. The form employed in *Mills* contained printed instructions for both the section respecting aggravating circumstances and that for mitigating circumstances. These instructions were identical but for the respective burdens of proof. In both, the term "unanimously" was used. Compounding this was the judge's instruction which indicated that both aggravating and mitigating circumstances had to be unanimously found.

The verdict slip employed in the instant case consisted of three pages. The requirement of unanimity is found only at page one in the section wherein the jury is to indicate its sentence. The second page of the form lists all the statutorily enumerated aggravating circumstances and includes next to each such circumstance a designated space for the jury to mark those circumstances found. The section where the jury is to checkmark those mitigating circumstances found, appears at page three and includes no reference to a finding of unanimity. Indeed, there are no printed instructions whatsoever on either page two or page three. The mere fact that immediately following that section of verdict slip, the jurors

46. Appellant submits that the PCRA court precluded expert testimony on this issue. Appellant here refers to the proffered testimony of one Professor John Lamberth who, according to the offer of proof, interviewed approximately thirty-five persons who had been jurors in death penalty cases before one particular judge, Judge Jackson. The offer of proof further provided that, as a result of those interviews, Dr. Lamberth had formed opinions about jurors in general. Apparently, it was proposed that he would testify regarding those opinions. The court precluded this testimony on the grounds that it was not only irrelevant, but also inadmissible. Not only was this proffered testimony irrelevant, but, as noted previously herein, a juror may not impeach or invalidate a verdict by his or her testimony. *Patrick, supra.* The court, thus, properly excluded this proffered testimony.

were required to each sign their name is of no moment since those signature lines naturally appear at the conclusion of the form and have no explicit correlation to the checklist of mitigating circumstances. As such, we cannot conclude, as Appellant urges, that the structure of the form could lead the jurors to believe that they must unanimously agree on mitigating evidence before such could be considered. Moreover, verdict slips similar to that employed in the instant matter have been held by our court not to violate the dictates of *Mills*. *See e.g. Commonwealth v. Murphy*, 540 Pa. 318, 657 A.2d 927 (1995).

 Appellant next submits that, in Pennsylvania, the death penalty is applied "disparately and freakishly" in ways that affected his case. Again, Appellant failed to raise this claim at trial or on direct appeal and, therefore, it is technically waived. Presumably, however, he is raising this claim, too, under the guise of prior counsels' ineffectiveness for failing to raise this issue. In any event, his claim lacks arguable merit.

Appellant claims that he repeatedly attempted to offer proof that Philadelphia County defendants were more likely to receive the death penalty and that sixty percent of the death row inmates in Pennsylvania are African–American, but was denied the ability to present evidence establishing such racial and geographic disparities. Our review of the record reveals, however, that Appellant never offered competent proof of such claims. In further support of this claim, Appellant reiterates four arguments raised elsewhere in his brief and which have already been addressed herein and rejected. (See, e.g. arguments respecting the Homicide Unit in Philadelphia; use of voter registration lists for jury selection process; prosecution's allegedly improper reference to Appellant's membership in the Black Panthers; and that three white jurors allegedly deliberated outside the presence of the remaining jurors.). Having thoroughly addressed each of these points already and having found none of them meritorious, it is clear that those claims provide no relief to Appellant here either.

Appellant submits that in denying this claim, the PCRA court erroneously relied upon *McCleskey v. Kemp*, 481 U.S.

279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Significantly, the PCRA court cited *McCleskey* for the proposition that a claim of constitutional violation cannot be established merely upon an allegation that a certain percentage of murderers sentenced to death in Pennsylvania are African–American. Appellant submits this was an erroneous application of that case since the PCRA court precluded his proffered evidence to support the claim. Appellant's claim is disingenuous. As the PCRA court noted, Appellant proffered nothing more than conclusory statements; he never offered to present facts in support thereof. As noted by Appellant, *McCleskey* requires proof of discriminatory intent; accordingly, the PCRA court's citation to *McCleskey* was proper.

■ Appellant submits that his Eighth and Fourteenth Amendment rights were violated because the jury was confused as to whether life imprisonment in Pennsylvania carried no possibility of parole. He argues that the United States Supreme Court decision in *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), dictates that the jury be informed that a life sentence carries with it no possibility of parole. He argues that counsel was ineffective for failing to seek a clarifying instruction and/or that the trial court erred in failing to correct this alleged error. Neither of these contentions warrants relief.

■ First of all, this court has clearly held that the decision in *Simmons* is not to be given retroactive effect in collateral attacks on a sentence.[47] *Christy*, 540 Pa. at 214–216, 656 A.2d at 888. In any event, there was no error committed here, and, thus, nothing on which to seek correction. Appellant's counsel did, indeed, inform the jury that life imprisonment meant precisely that and that parole was an unlikely event. Contrary to Appellant's assertion, the trial court's interruption of the summation was not done in a manner so as to instill in the jury's minds the notion that some persons

47. Further, counsel cannot be deemed ineffective for failing to predict changes in the law. *Commonwealth v. Triplett*, 476 Pa. 83, 381 A.2d 877 (1977).

sentenced to life imprisonment are "out in a few years." (Brief of Appellant at p. 117). Appellant's counsel was not interrupted until after he informed the jury as to the harshness of a sentence of life imprisonment and that the jury should realize that a sentence of life would likely be just that. Upon review of this particular portion of the defense summation, we cannot conclude, as suggested by Appellant, that the jury would have believed that the imposition of a life sentence might have resulted in Appellant being released from prison. Instead we find that the jury was informed of precisely what Appellant now argues he was entitled; that a defendant sentenced to life is not likely to receive parole.

Appellant's final claim is that the cumulative effect of all his alleged errors denied him a fair trial. However, as we have concluded that none of his claims, considered on their individual merits, warrants relief, the instant claim of Appellant also does not warrant relief. *Commonwealth v. Williams,* 532 Pa. 265, 615 A.2d 716 (1992)(no number of failed claims may collectively attain merit where they could not do so individually).

For all the foregoing reasons, we affirm the denial of post-conviction relief.[48]

---

48. The Prothonotary of the Supreme Court is directed to transmit the complete record of this case back to the Governor. 42 Pa.C.S. § 9711(i).